UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION


UNITED STATES OF AMERICA,          )
                                   )
            V.                     )      7:10-CR-11-H
                                   )
RUSHAUN NECKO PARKER,              )
                                   )
            DEFENDANT.             )
_____    )


TRIAL TESTIMONY OF CORIE BATTS
MARCH 1, 2011
BEFORE THE HONORABLE MALCOLM J. HOWARD
SENIOR U.S. DISTRICT JUDGE



APPEARANCES:


FOR THE GOVERNMENT:

MR. TIMOTHY SEVERO
SPEC. ASST. U.S. ATTORNEY
310 NEW BERN AVE.
RALEIGH, NC


FOR THE DEFENDANT:

MR. JAMES WALEN
ATTORNEY AT LAW
P.O. BOX 2125
MOREHEAD CITY, NC




COURT REPORTER:  DONNA J. TOMAWSKI
STENOTYPE WITH COMPUTER AIDED TRANSCRIPTION

MARCH 1, 2011

**MR. SEVERO:**  YOUR HONOR, THE GOVERNMENT CALLS CORIE BATTS TO THE STAND.

**CORIE BATTS**, BEING FIRST DULY SWORN, TESTIFIED AS FOLLOWS DURING **EXAMINATION**:

**THE COURT:**  YOU MAY PROCEED, MR. SEVERO.

**BY MR. SEVERO:**

**Q.**  CAN YOU PLEASE STATE YOUR NAME FOR THE JURY?

**A.**  YES.  MY NAME IS CORIE BATTS.

**Q.**  DO YOU HAVE A MIDDLE NAME, MR. BATTS?

**A.**  JAQUAN.

**Q.**  HOW OLD ARE YOU, MR. BATTS?

**A.**  TWENTY-NINE YEARS OF AGE.

**Q.**  WHERE ARE YOU CURRENTLY LIVING OR BEING HOUSED?

**A.**  BEING HOUSED HERE LOCAL AT THE GREENVILLE COUNTY JAIL.

**Q.**  ARE YOU IN JAIL?

**A.**  YES.

**Q.**  AND HAVE YOU BEEN IN JAIL FOR AWHILE?

**A.**  YES, SIR.

**Q.**  PRIOR TO BEING IN JAIL -- LET ME ASK YOU THIS:  DO YOU HAVE ANY MILITARY EXPERIENCE?

**A.**  YES, SIR.

**Q.**  CAN YOU TELL THE MEMBERS OF THE JURY ABOUT YOUR MILITARY EXPERIENCE?

1  **A.**  YES, SIR.  I WAS IN THE MILITARY FROM 2001 TO

2  FEBRUARY 27, 2007.  I DONE THREE TOTAL OVERSEAS TOURS.  I

3  WENT TO KUWAIT WHERE I DID BORDER PATROL TO INITIALLY

4  INVADE IRAQ.  I INVADED IRAQ WITH 3RD INFANTRY DIVISION,

5  3RD ID, OUT OF FORT BENNING, GEORGIA.  I WAS PART OF

6  CHARLIE COMPANY 269 ARMOR, ARMY INFANTRY.

7  I DID A SIX-MONTH TOUR WHERE WE DID 21 DAYS

8  CONTINUOUS BATTLE.  WE CAME BACK AND RESET FOR

9  APPROXIMATELY THREE TO FOUR MONTHS.  THE CURRENT UNITS

10  WERE HAVING TROUBLE OVER THERE SO THEY SENT US BACK OVER

11  THERE FOR A TOUR OF 18 MONTHS.  I DID A TOTAL OF 18 MONTHS

12  BACK IN THE COMBAT ZONE.  DURING THAT TIME, I WAS ALSO

13  PART OF THE SECURITY DETACHMENT FOR COLONEL SANDERSON THAT

14  LED THE 3RD INFANTRY BATTALION INTO THE WAR.  WE DID

15  ASSAULTS, RAIDS, TOOK DOWN THE BAD GUYS.

16  **Q.**  AT SOME POINT DID YOU RETURN BACK TO THE UNITED

17  STATES?

18  **A.**  YES, SIR.

19  **Q.**  APPROXIMATELY WHEN WAS THAT?

20  **A.**  APPROXIMATELY 2006, JUNE 2006.

21  **Q.**  AT SOME POINT AFTER THAT DID YOU GET ARRESTED?

22  **A.**  YES.

23  **Q.**  WERE YOU ARRESTED FOR SELLING NARCOTICS OR DRUGS?

24  **A.**  YES.

25  **Q.**  WERE YOU SPECIFICALLY ARRESTED FOR SELLING COCAINE

1  BASE OR CRACK COCAINE?

2  **A.**  YES, SIR.

3  **Q.**  AFTER -- WERE YOU HONORABLY DISCHARGED?

4  **A.**  YES, SIR.

5  **Q.**  AND AFTER YOU WERE ARRESTED FOR SELLING COCAINE BASE,

6  DID AGENTS WITH THE FBI TALK TO YOU?

7  **A.**  YES, SIR.

8  **Q.**  DID THEY ASK YOU WHETHER YOU WANTED TO HELP YOURSELF

9  OR ASSIST THEM?

10  **A.**  YES, SIR.

11  **Q.**  DID YOU AGREE TO DO THAT?

12  **A.**  YES, SIR.

13  **Q.**  HAVE YOU ENTERED INTO A GUILTY PLEA OR SOME SORT OF

14  PLEA WITH THE FEDERAL GOVERNMENT?

15  **A.**  YES, SIR.

16  **Q.**  CAN YOU TELL THE MEMBERS OF THE JURY WHAT YOU PLED

17  GUILTY TO?

18  **A.**  YES.  I PLED GUILTY TO 50 GRAMS OR MORE OF CRACK

19  COCAINE BASE, CONSPIRACY.  ONE COUNT CONSPIRACY.

20  **Q.**  DID YOU SIGN OR ENTER INTO A PLEA AGREEMENT?

21  **A.**  YES.

22        **MR. SEVERO:**  MAY I APPROACH, YOUR HONOR?

23        **THE COURT:**  YOU MAY.

24  **BY MR. SEVERO:**

25  **Q.**  MR. BATTS, I'LL ASK YOU TO LOOK AT THAT AND ASK YOU

1    IF YOU RECOGNIZE GOVERNMENT'S EXHIBIT NO. 37, THAT ITEM?

2    **A.**   YES, SIR.

3    **Q.**   HAVE YOU BEEN PROMISED ANYTHING OR DO YOU KNOW --

4    HAVE YOU BEEN SENTENCED YET?

5    **A.**   NO, SIR.

6    **Q.**   HAS THE GOVERNMENT MADE YOU ANY TYPE OF PROMISES OR

7    REPRESENTATIONS TO YOU AS TO WHAT YOUR SENTENCE WILL BE?

8    **A.**   NO, SIR.

9    **Q.**   IS THERE ANYTHING THAT'S CONTAINED OR LISTED IN YOUR

10   PLEA AGREEMENT ABOUT TESTIFYING OR BEING CALLED UPON AS A

11   WITNESS?

12   **A.**   YES, SIR.

13   **Q.**   AND WHAT IF ANYTHING IS REQUIRED OF YOU IN YOUR PLEA

14   AGREEMENT?

15   **A.**   IT WOULD BE UNDER LETTER H, WHENEVER CALLED UPON TO

16   DO SO BY THE UNITED STATES, TO DISCLOSE FULLY AND

17   TRUTHFULLY IN INTERVIEWS WITH GOVERNMENT AGENTS

18   INFORMATION CONCERNING ALL CONDUCT RELATED TO THE

19   INFORMATION AND ANY OTHER CRIMES OF WHICH THE DEFENDANT

20   HAS KNOWLEDGE, AND TO TESTIFY FULLY AND TRUTHFULLY IN ANY

21   PROCEEDING.  THESE OBLIGATIONS ARE CONTINUING ONES.  THE

22   DEFENDANT AGREES THAT ALL OF THESE STATEMENTS CAN BE USED

23   AGAINST THE DEFENDANT AT TRIAL IF THE DEFENDANT WITHDRAWS

24   FROM THE PLEA AGREEMENT OR IS ALLOWED TO WITHDRAW THE

25   GUILTY PLEA.

1  **Q.**   MR. BATTS, DO YOU RECOGNIZE THAT DOCUMENT RIGHT

2  THERE?

3  **A.**   YES, SIR.

4  **Q.**   IS THAT A COPY YOUR PLEA AGREEMENT?

5  **A.**   YES, SIR.

6          **MR. SEVERO:**  YOUR HONOR, I MOVE TO INTRODUCE

7  THAT.

8          **THE COURT:**  LET 37 BE ADMITTED.

9  **BY MR. SEVERO:**

10 **Q.**   ARE YOU AWARE WHAT WILL HAPPEN TO YOU IF YOU DON'T

11 PROVIDE TRUTHFUL TESTIMONY?

12 **A.**   YES, SIR.

13 **Q.**   WHAT IS THAT?

14 **A.**   IF I DON'T PROVIDE TRUTHFUL INFORMATION, THAT WILL BE

15 A BREACH OF THE AGREEMENT, I COULD BE CHARGED WITH PERJURY

16 AND TAKE MORE CHARGES, ENDURE MORE CHARGES, CRIMINAL

17 CHARGES.

18 **Q.**   ARE YOU FAMILIAR OR AWARE OF WHO THE PERSON IS WHO'S

19 GOING TO DETERMINE YOUR SENTENCE?

20 **A.**   YES.

21 **Q.**   WHO IS THAT?

22 **A.**   THAT'S THE JUDGE, JUDGE DEVER.  JUDGE JAMES C. DEVER

23 III.

24 **Q.**   AND WERE YOU, PRIOR TO NOVEMBER 8 OF 2009, HAD YOU

25 BEEN WORKING AS A CONFIDENTIAL INFORMANT OR ASSISTING LAW

1  ENFORCEMENT?

2  **A.**  YES.

3  **Q.**  AND WERE YOU STILL DOING THAT ON NOVEMBER 8 OF 2009?

4  **A.**  YES.

5  **Q.**  TURNING YOUR ATTENTION OR GOING TO THAT DAY, DID YOU

6  MEET ANYBODY OR HAVE A CONVERSATION WITH ANYBODY ON THAT

7  DAY ABOUT CONTROLLED SUBSTANCES OR CRACK COCAINE?

8  **A.**  YES.

9  **Q.**  WHO WAS THAT?

10  **A.**  DUKE.

11  **Q.**  DID YOU KNOW DUKE OR -- THE PERSON THAT YOU SAID THE

12  NAME DUKE, HOW LONG HAVE YOU KNOWN THAT PERSON BEFORE

13  NOVEMBER 8 OF 2009?

14  **A.**  I DON'T REALLY KNOW HIM, SIR.

15  **Q.**  HAD YOU MET HIM BEFORE NOVEMBER 8 OF 2009?

16  **A.**  YES, I MET HIM THROUGH SOMEONE ELSE.

17  **Q.**  WHO WOULD THAT SOMEONE ELSE BE?

18  **A.**  MANUEL ROBINSON.

19  **Q.**  IS THAT PERSON KNOWN AS MANUEL ROBINSON, DO THEY HAVE

20  A STREET NAME OR NICKNAME?

21  **A.**  SKEET.

22  **Q.**  THE PERSON THAT YOU MENTIONED OR SAID THE NAME DUKE,

23  DO YOU SEE THAT PERSON IN THE COURTROOM?

24  **A.**  YES.

25  **Q.**  CAN YOU PLEASE IDENTIFY THE PERSON?

1  **A.**   THE DEFENDANT.

2  **Q.**   CAN YOU SAY WHAT IF ANYTHING HE'S WEARING?

3  **A.**   HE'S WEARING A PLAID COLORED SHIRT, LIGHT GREEN, DARK

4  BLUE STRIPES.

5          **THE COURT:**  LET THE RECORD REFLECT THE

6  TESTIFYING WITNESS IDENTIFIES THE DEFENDANT, RUSHAUN

7  PARKER.

8  **BY MR. SEVERO:**

9  **Q.**   WHERE DID YOU FIRST MEET THE DEFENDANT?  ON

10 NOVEMBER 8, WHERE DID YOU MEET HIM?

11 **A.**   I MET HIM AT HIS RESIDENCE.

12 **Q.**   DO YOU KNOW WHERE THAT IS?

13 **A.**   THAT'S ON HENRY STREET, 430-SOMETHING HENRY.

14 **Q.**   WOULD YOU RECOGNIZE A PHOTOGRAPH OF IT?

15 **A.**   YES.

16          **MR. SEVERO:**  YOUR HONOR, MOVE TO PUBLISH

17 GOVERNMENT'S EXHIBIT NO. 10.

18          **THE COURT:**  YOU MAY.

19 **BY MR. SEVERO:**

20 **Q.**   MR. BATTS, I'LL HAVE YOU LOOK AT THAT ITEM AND ASK

21 YOU IF YOU RECOGNIZE THAT?

22 **A.**   YES.

23 **Q.**   WHAT IS THAT?

24 **A.**   THAT'S THE DEFENDANT'S HOME.

25 **Q.**   OKAY.  AND WHEN ON NOVEMBER 8, BECAUSE THAT

1  PHOTOGRAPH, WOULD IT SHOW OR ILLUSTRATE THE AREA IN WHICH

2  YOU MET DUKE ON THAT DAY?

3  **A.**   YES, SIR.

4  **Q.**   OKAY.  LOOKING AT THAT PHOTOGRAPH, WHERE DID YOU

5  FIRST MEET THE DEFENDANT?

6  **A.**   I MET THE DEFENDANT RIGHT IN FRONT OF THIS ROPE, THE

7  LEFT PART OF THE HOUSE RIGHT IN FRONT OF THIS ROPE LOCATED

8  RIGHT HERE (INDICATING).

9  **Q.**   OKAY.  WHEN YOU SAY "RIGHT HERE," CAN YOU TOUCH THE

10  SCREEN?

11  **A.**   YES.  RIGHT IN THIS AREA HERE (INDICATING).

12  **Q.**   HAVE YOU MADE SORT OF -- IS THERE A WHITE LINE THERE?

13  **A.**   YES, SIR.

14  **Q.**   AND WAS THERE ANY TYPE OF AUTOMOBILE OR VEHICLES

15  THERE?

16  **A.**   YES.

17  **Q.**   OKAY.  WHAT AUTOMOBILES OR VEHICLES WERE THERE?

18  **A.**   MERCEDES.

19  **Q.**   DO YOU RECALL WHAT COLOR IT WAS?

20  **A.**   WHITE MERCEDES.

21  **Q.**   AND HOW DID YOU GET THERE?

22  **A.**   I WAS ESCORTED THERE.  DROVE MY VEHICLE THERE,

23  ESCORTED FROM THE FBI LOCATION.

24  **Q.**   BUT I'M REFERRING TO NOVEMBER 8.  DID YOU MEET WITH

25  DUKE ON NOVEMBER 8?

1    **A.**   YES, YES, YES.

2    **Q.**   OKAY.

3    **A.**   I ACTUALLY DROVE TO THE AREA IN MY OWN PERSONAL

4    VEHICLE.

5    **Q.**   ON THE 8TH?

6    **A.**   ON THE 8TH.

7    **Q.**   AND DID YOU MEET WITH THE DEFENDANT ON THE 8TH?

8    **A.**   YES, I DID.

9    **Q.**   DID YOU MEET WITH HIM IN THE EVENING HOURS?

10   **A.**   IT WAS LATE HOURS.

11   **Q.**   WHEN YOU SAY LATE HOURS, WHAT DOES THAT MEAN?

12   **A.**   IT WAS AROUND APPROXIMATELY 10:30, 11, BETWEEN

13   10:30 P.M. AND 11.

14   **Q.**   CAN YOU, ON THE DIAGRAM, SHOW WHERE YOU, IF YOU CAN,

15   WHERE YOU MET THE DEFENDANT?

16   **A.**   YES.  SAME LOCATION, RIGHT HERE (INDICATING).  MAYBE

17   A LITTLE CLOSER.

18   **Q.**   HOW DID YOU GET THERE ON NOVEMBER 8?

19   **A.**   DROVE MY VEHICLE.

20   **Q.**   WHAT TYPE OF VEHICLE DID YOU HAVE?

21   **A.**   GRAY HONDA.

22   **Q.**   WERE THERE ANY OTHER VEHICLES THERE?

23   **A.**   IT WAS JUST HIS VEHICLE.

24   **Q.**   WHEN YOU SAY "HIS VEHICLE," WHO ARE YOU TALKING ABOUT

25   AND WHAT TYPE OF CAR?

1  **A.**   DUKE'S VEHICLE, WHITE MERCEDES.

2  **Q.**   WAS ANYBODY WITH THE DEFENDANT AT THAT TIME?

3  **A.**   YES.

4  **Q.**   WHO IS THAT?

5  **A.**   SKEET.

6  **Q.**   AND CAN YOU TELL FROM GOVERNMENT'S EXHIBIT NO. 10 OR

7  SHOW IN THE AREA BY PUTTING AN X WHERE YOU-ALL MET?

8  **A.**   YES.  RIGHT HERE (INDICATING).

9  **Q.**   IS THAT JUST OFF THE SIDE FROM A PATH THAT LEADS TO

10  THE HOUSE?

11  **A.**   YES.

12  **Q.**   DID YOU MEET IN THE STREET OR IN THE YARD?

13  **A.**   IN THE STREET.

14  **Q.**   TELL THE JURY WHAT HAPPENED AFTER YOU MET?

15  **A.**   AFTER WE MET, WE DISCUSSED -- I ASKED DUKE ABOUT

16  GETTING SOME CRACK COCAINE, 2 OUNCES OF CRACK COCAINE.  AT

17  THAT TIME HE SHOWED ME AN OUNCE OF CRACK COCAINE, IT WAS

18  PLACED ON THE HOOD OF HIS WHITE MERCEDES.  I TOLD HIM THAT

19  I WOULD CALL HIM IN REFERENCE TO PURCHASING THE 2 OUNCES

20  THE NEXT DAY.

21  **Q.**   AND WHERE -- WAS MR. ROBINSON OR SKEET, WAS HE

22  PRESENT?

23  **A.**   YES.

24  **Q.**   WHERE WAS HE WHEN DUKE SHOWED YOU THAT?

25  **A.**   HE WAS STANDING RIGHT THERE WITH US.

1    Q.    NOW, THE 2 OUNCES THAT YOU REFERRED TO, DOES THAT

2    HAVE ANY SORT OF NAME OR STREET TERM THAT YOU WOULD BE

3    FAMILIAR WITH?

4    A.    BOY.

5    Q.    AND IS THE WEIGHT OR TYPE OR WEIGHT IN THAT AMOUNT

6    REFERRED TO ANYTHING, OR IS THERE A NAME?

7    A.    A DEUCE.

8    Q.    AND DID YOU PURCHASE ANY COCAINE ON THE EVENING HOURS

9    OF NOVEMBER 8?

10   A.    NO, SIR.

11   Q.    WHY NOT?

12   A.    I WAS THE CI AND I WAS TOLD TO REPORT ANYTHING THAT'S

13   UNDER THE CONTRACT THAT I SIGNED.  ANY ACTIVITY LIKE THAT

14   HAS TO BE IMMEDIATELY REPORTED ONCE LEAVING THE AREA.

15   Q.    SO PRIOR TO NOVEMBER 8, HAD YOU BEEN TOLD OR

16   EXPLAINED RULES ABOUT BEING A CONFIDENTIAL INFORMANT?

17   A.    YES.

18   Q.    DO YOU SEE ANY OF THE PEOPLE IN THE COURTROOM WHO

19   EXPLAINED THOSE RULES TO YOU?

20   A.    YES.

21   Q.    CAN YOU IDENTIFY THEM OR TELL WHERE THEY ARE?

22   A.    YES.  I WAS EXPLAINED BY AGENT TAYLOR, ALSO BY TASK

23   FORCE OFFICER JASON NICHOLS.

24   Q.    ARE THEY IN THE COURTROOM?

25   A.    YES, SIR.

**Q.** CAN YOU IDENTIFY THEM?

**A.** MR. TAYLOR IS SITTING TO YOUR LEFT AND DIRECTLY

BEHIND HIM IS TASK FORCE OFFICER JASON NICHOLS.

**Q.** DID THEY GIVE YOU ANY RULES OR REQUIREMENTS OR TELL

YOU WHAT WOULD HAPPEN IF YOU WERE FOUND WITH CONTROLLED

SUBSTANCES THAT YOU DIDN'T PURCHASE AT THEIR DIRECTION?

**A.** YES. I WOULD BE PROSECUTED AND ANYTHING THAT I HAVE

BROUGHT TO THE TABLE WILL NOT COUNT AT ALL; I WOULD GET NO

CREDIT.

**Q.** AFTER WHAT YOU JUST DESCRIBED ON NOVEMBER 8 OF 2009,

DID YOU CONTACT ANYONE?

**A.** I CONTACTED JASON NICHOLS.

**Q.** HOW DID YOU CONTACT HIM?

**A.** I CALLED HIM.

**Q.** DID YOU TELL HIM ANYTHING?

**A.** YES. I TOLD HIM THAT I JUST MET WITH DUKE AND WE

DISCUSSED THE PURCHASE OF A DEUCE, WHICH IS 62 GRAMS OF

CRACK COCAINE.

**Q.** DID YOU MAKE ANY ARRANGEMENTS OR ANY PLANS AS TO WHEN

YOU MIGHT DO THAT?

**A.** I WAS TOLD TO COME IN THE NEXT DAY TO THE OFFICE, I

WOULD BE CALLED.

**Q.** WOULD THAT BE NOVEMBER 9 OF 2009?

**A.** YES.

**Q.** DID YOU IN FACT GO SOMEWHERE ON NOVEMBER 9, 2009, AT

1   THEIR DIRECTION?

2   **A.**   YES.

3   **Q.**   WHERE DID YOU GO TO?

4   **A.**   I MET AT THE FBI LOCATION.

5   **Q.**   DID YOU MEET ANYBODY WHEN YOU GOT THERE?

6   **A.**   I MET WITH THE AGENTS.

7   **Q.**   WERE YOU SHOWN ANYTHING WHEN YOU GOT TO THE FBI

8   OFFICE?

9   **A.**   YES.  I WAS SHOWN A PICTURE OF DUKE.

10          **MR. SEVERO:**  YOUR HONOR, I WOULD MOVE TO PUBLISH

11  GOVERNMENT'S EXHIBIT NO. 14.

12          **THE COURT:**  LET IT BE DONE.

13  **BY MR. SEVERO:**

14  **Q.**   MR. BATTS, I'LL ASK YOU TO LOOK AT WHAT'S PREVIOUSLY

15  BEEN INTRODUCED AS GOVERNMENT'S EXHIBIT NO. 14 AND ASK YOU

16  IF YOU RECOGNIZE THAT?

17  **A.**   YES.

18  **Q.**   AND WHAT IS THAT, FIRST OFF?

19  **A.**   THAT'S THE FIRST PICTURE I WAS SHOWED AT THE FBI

20  LOCATION WHERE I IDENTIFIED DUKE.

21  **Q.**   AND DID YOU WRITE ANYTHING ON THAT DOCUMENT?

22  **A.**   YES.  I WROTE "DUKE" AT THE TOP OF IT.  I WROTE

23  "110 PERCENT" I WAS SURE THAT WAS HIM.  I ALSO SIGNED AND

24  DATED IT.

25  **Q.**   WHAT NAME DID YOU SIGN AND DATE IT WITH?

1   **A.**   HUGGIE BEAR.

2   **Q.**   WHAT'S THAT?

3   **A.**   HUGGIE BEAR WAS MY CODE NAME OR GOVERNMENT NAME.

4   **Q.**   AND WHO HAD GIVEN YOU THAT NAME OR NICKNAME?  DID YOU

5   COME UP WITH IT OR DID THE AGENTS COME UP WITH IT?  HOW

6   DID THAT HAPPEN?

7   **A.**   I CAN'T REALLY RECALL.

8   **Q.**   DID YOU -- AFTER BEING SHOWN THAT PICTURE, WHAT'S THE

9   NEXT THING THAT HAPPENED?

10  **A.**   I WAS SHOWN ANOTHER PICTURE TO IDENTIFY DUKE.

11  **Q.**   WERE YOU AT ANY TIME EVER SHOWN MORE THAN ONE

12  PICTURE?

13  **A.**   COULD YOU REPEAT THAT AGAIN, SIR?

14  **Q.**   AT ANY TIME ON THE 9TH WERE YOU EVER SHOWN MORE THAN

15  ONE, OR JUST ONE PICTURE?

16  **A.**   YES.

17  **Q.**   WHERE WAS THAT AND WHERE DID THAT OCCUR?

18  **A.**   THAT WAS AFTER I WAS SHOWN THE FIRST PICTURE WHERE I

19  IDENTIFIED HIM AND I WAS SHOWN ANOTHER SET OF PICTURES

20  WHERE I IDENTIFIED DUKE AGAIN.

21  **Q.**   BEFORE THAT, WERE YOU GIVEN ANYTHING BY THE

22  OFFICERS -- WERE YOU GIVEN ANY SORT OF ITEMS OR ANYTHING

23  ON NOVEMBER 9?

24  **A.**   NO, SIR.

25  **Q.**   DID THERE COME A TIME ON NOVEMBER 9, 2009, THAT YOU

1   WERE GIVEN ANY MONEY?

2   **A.**   YES.

3   **Q.**   WHO GAVE YOU THE MONEY AND WHERE DID THAT HAPPEN?

4   **A.**   AFTER I IDENTIFIED THE PICTURES, I WAS GIVEN MONEY

5   FROM THE AGENT.

6   **Q.**   DO YOU RECALL THE AGENT THAT GAVE YOU MONEY?

7   **A.**   NO, SIR.

8   **Q.**   DO YOU KNOW HOW MUCH MONEY YOU WERE GIVEN?

9   **A.**   YES.  I WAS GIVEN $2,000.

10  **Q.**   AND DID YOU DO ANYTHING WITH THE $2,000 ONCE IT WAS

11  GIVEN TO YOU?

12  **A.**   I RECOUNTED IT TO MAKE SURE THAT IT WAS 2,000 AND I

13  SIGNED FOR THE MONEY.

14  **Q.**   WERE YOU GIVEN ANY SORT OF MECHANICAL OR ELECTRONIC

15  THINGS BY THE OFFICERS?

16  **A.**   YES.  I WAS GIVEN A RECORDING DEVICE, A TRANSMITTER.

17  **Q.**   AT SOME TIME WHILE YOU WERE THERE WERE YOU ASKED OR

18  DIRECTED TO DO ANYTHING AS IT RELATES TO THE TELEPHONE?

19  **A.**   YES.

20  **Q.**   WHAT WAS THAT?

21  **A.**   I PLACED A TELEPHONE ON ME AS THE TRANSMITTER.

22  **Q.**   WHILE YOU WERE AT THE FBI OFFICE, WERE YOU EVER ASKED

23  TO MAKE A TELEPHONE CALL?

24  **A.**   YES, SIR.

25  **Q.**   AND WHO ASKED YOU TO MAKE A TELEPHONE CALL?

**A.**   ONE OF THE AGENTS.

**Q.**   DID YOU MAKE A TELEPHONE CALL?

**A.**   YES, SIR.

**Q.**   AND DID YOU DIAL A NUMBER?  DID YOU DIAL THE NUMBER; DID YOU MAKE THE CALL?

**A.**   I CAN'T REMEMBER IF I DIALED IT OR NOT, BUT THE NUMBER WAS DIALED, SIR.

**Q.**   DID YOU PLACE A PHONE CALL?

**A.**   YES.

**Q.**   AND THE NUMBER THAT WAS CALLED, WAS THAT A NUMBER THAT YOU HAD?

**A.**   YES.

**Q.**   AND WHO HAD YOU GOTTEN THAT PHONE NUMBER FROM?

**A.**   DUKE.

**Q.**   THE DEFENDANT?

**A.**   YES.

**Q.**   DID SOMEBODY PICK UP OR ANSWER THE PHONE AFTER IT WAS DIALED?

**A.**   YES.

**Q.**   AND TO YOUR KNOWLEDGE, WAS THAT PHONE CALL RECORDED?

**A.**   YES.

**Q.**   HAVE YOU HAD AN OCCASION OR HAVE YOU -- WHO DID YOU SPEAK TO ON THE PHONE, IF ANYONE?

**A.**   I SPOKE WITH THE DEFENDANT.

**Q.**   IS THAT DUKE?

1   **A.**   DUKE.

2   **Q.**   AND WAS THAT -- TO YOUR KNOWLEDGE, WAS THAT PHONE

3   CALL RECORDED?

4   **A.**   YES.

5   **Q.**   DO YOU REMEMBER WHAT YOU SAID OR ANYTHING ABOUT THE

6   PHONE CONVERSATION?

7   **A.**   THE PHONE CONVERSATION CONSISTED OF GETTING IN

8   CONTACT WITH DUKE TO PURCHASE A DEUCE OF CRACK, COCAINE

9   BASE.

10  **Q.**   DID YOU SPEAK WITH THE DEFENDANT?

11  **A.**   YES.

12  **Q.**   HAVE YOU HAD -- HAS A RECORDING OF THE PHONE CALL

13  BEEN PLAYED FOR YOU?

14  **A.**   YES.

15  **Q.**   HAVE YOU LISTENED TO IT?

16  **A.**   YES.

17  **Q.**   IS IT THE SAME PHONE CALL THAT YOU PLACED AND MADE ON

18  NOVEMBER 9 OF 2009?

19  **A.**   YES.

20  **Q.**   HAVE YOU ALSO LOOKED AT A TRANSCRIPT OR WRITTEN NOTES

21  OF THAT PHONE CALL?

22  **A.**   YES.

23  **Q.**   DID YOU COMPARE THOSE WRITTEN NOTES OR THAT

24  TRANSCRIPT TO THE DISK?

25  **A.**   YES.

1  **Q.**  AND ARE THEY THE SAME WORDS THAT YOU SPOKE AND THE

2  DEFENDANT SPOKE ON NOVEMBER 9 OF 2009?

3  **A.**  YES.

4  **Q.**  DID SOMEBODY ELSE SPEAK ON THAT PHONE CALL BEFORE YOU

5  OR THE DEFENDANT, IF YOU KNOW?

6  **A.**  IT WAS ONE OF THE AGENTS.

7          **MR. SEVERO:**  MAY I APPROACH, YOUR HONOR?

8          **THE COURT:**  YOU MAY.

9  **BY MR. SEVERO:**

10 **Q.**  FIRST OFF, I'LL SHOW YOU WHAT'S PREVIOUSLY BEEN

11 INTRODUCED AS GOVERNMENT'S EXHIBIT NO. 19, MR. BATTS, AND

12 ASK YOU TO LOOK AT THAT AND ASK YOU IF YOU RECOGNIZE THAT?

13 **A.**  YES, SIR.

14 **Q.**  WHAT IS THAT?

15 **A.**  THIS IS THE DISK THAT I INITIALED.

16 **Q.**  HAVE YOU LISTENED TO THAT DISK?

17 **A.**  YES.

18 **Q.**  DID YOU INITIAL THAT DISK AFTER YOU LISTENED TO IT?

19 **A.**  YES.

20 **Q.**  DOES IT FAIRLY AND ACCURATELY CONTAIN ALL THE WORDS

21 THAT YOU SPOKE AND THE DEFENDANT SPOKE ON NOVEMBER 9,

22 2009, DURING THAT PHONE CALL?

23 **A.**  YES, SIR.

24 **Q.**  I'LL SHOW YOU AND ASK YOU TO LOOK AT THIS DOCUMENT

25 AND ASK YOU IF YOU RECOGNIZE THAT.  DO YOU RECOGNIZE THAT?

**A.**   YES, SIR.

**Q.**   THAT'S GOVERNMENT'S EXHIBIT NO. 20.  DID YOU WRITE OR SIGN THAT DOCUMENT?

**A.**   YES, SIR.

**Q.**   IS YOUR NAME WRITTEN AT THE BOTTOM?

**A.**   YES, SIR.

**Q.**   DOES THIS TRANSCRIPT FAIRLY AND ACCURATELY REFLECT THE WORDS, TO THE BEST OF YOUR ABILITY, THAT WERE SPOKEN THAT DAY BETWEEN YOURSELF AND THE DEFENDANT?

**A.**   YES, SIR.

          **MR. SEVERO:**  YOUR HONOR, I WOULD MOVE TO PUBLISH AGAIN THE DISK OF THE PHONE CALL AT THIS TIME.

          **THE COURT:**  OKAY.  GO AHEAD.

          (AUDIO TAPE PLAYED FOR THE JURY.)

**BY MR. SEVERO:**

**Q.**   WHOSE VOICES ARE ON THAT RECORDED PHONE CALL; ARE YOU FAMILIAR WITH THE VOICES?

**A.**   YES.

**Q.**   WHOSE VOICES ARE ON THE PHONE CALL?

**A.**   MY VOICE AND DUKE'S VOICE.

**Q.**   DUKE BEING THE DEFENDANT?

**A.**   YES.

**Q.**   WHEN YOU SAID, "WHAT'S UP DUKE," WHO ARE YOU REFERRING TO?

**A.**   THE DEFENDANT.

1  **Q.**  WHEN YOU SAID, "THIS IS SKEET'S COUSIN," WHAT DID YOU

2  MEAN BY THAT?

3  **A.**  REFERRING TO MANUEL ROBINSON.

4  **Q.**  WHY DID YOU IDENTIFY YOURSELF AT THAT TIME AS SKEET'S

5  COUSIN?

6  **A.**  SKEET ALWAYS THOUGHT I WAS HIS COUSIN.  I JUST KIND

7  OF LEFT IT AT THAT.

8  **Q.**  YOU ARE FAMILIAR WITH HOW DRUGS ARE SOLD, AREN'T YOU?

9  **A.**  YES.

10  **Q.**  BASED UPON YOUR EXPERIENCES, DID YOU -- IS THERE ANY

11  REASON OR ANY WAY YOU WOULD TRY TO USE SOMEBODY YOU KNEW

12  AS AN INTRODUCTION OR REFERENCE?

13  **A.**  YES.

14  **Q.**  WHY IS THAT?

15  **A.**  IT'S A WAY OF GETTING TO THE SOURCE OF GETTING WHAT

16  YOU WANT, TRYING TO GET ACQUAINTED WITH THE PERSON TO HAVE

17  A BETTER SENSE OF SECURITY WHEN DEALING WITH THAT PERSON.

18  **Q.**  HAD YOU EVER BOUGHT DRUGS FROM THE DEFENDANT BEFORE

19  NOVEMBER 9?

20  **A.**  NO, SIR.

21  **Q.**  WHEN YOU SAID, "I MET YOU LAST NIGHT," WHAT WERE YOU

22  REFERRING TO?

23  **A.**  I WAS REFERRING TO WHEN WE FIRST MET THE DAY PRIOR

24  WHERE WE DISCUSSED THE PURCHASE OF THE DEUCE.

25  **Q.**  NOW, WHEN YOU SAID, "ARE YOU STILL GOING TO DO THAT

1   FOR ME," WHAT WERE YOU REFERRING TO?

2   **A.**   TO 2 OUNCES OF CRACK COCAINE BASE.

3   **Q.**   AND DOES THAT HAVE A STREET NAME OR NICKNAME OR SOME

4   WAY THAT YOU IDENTIFIED IT?

5   **A.**   DEUCE OR BOY.

6   **Q.**   AND WHEN MR. PARKER SAID, "YOU ARE GOING TO HAVE TO

7   COME TO WHERE I WAS AT," WHAT DID THAT MEAN TO YOU?

8   **A.**   THAT'S WHERE WE MET THE NIGHT PRIOR, THE SAME

9   LOCATION.

10  **Q.**   AND DID YOU LEAVE -- STRIKE THAT.

11      AT SOME POINT THERE, DID YOU HAVE AN INTERACTION WITH

12  LAW ENFORCEMENT OR DID THEY LOOK AT YOU OR HAVE AN

13  INVOLVEMENT WITH YOU IN ANY WAY?

14  **A.**   I DIDN'T UNDERSTAND THAT, SIR.

15  **Q.**   WERE YOU SEARCHED ON NOVEMBER 9?

16  **A.**   YES.

17  **Q.**   AND WHERE WERE YOU SEARCHED?

18  **A.**   I WAS SEARCHED AT THE FBI LOCATION.

19  **Q.**   CAN YOU TELL THE MEMBERS OF THE JURY HOW YOU WERE

20  SEARCHED?

21  **A.**   YES.  WHEN YOU COME IN, YOU HAND OVER YOUR KEYS,

22  SOMEONE WILL SEARCH YOUR VEHICLE, YOU WILL NOT BE PRESENT

23  WHEN THAT VEHICLE IS BEING SEARCHED.  YOU WILL BE

24  THOROUGHLY SEARCHED.  YOU REMOVE ALL GARMENTS.  THEY CHECK

25  IN BETWEEN YOUR TOES, CHECK ALL THE WAY UP TO YOUR GROIN

1 AREA, YOUR RECTUM AREA, ALL THE WAY UP TO YOUR HEAD AREA,

2 TOP TO BOTTOM SEARCH.  AFTER THAT, YOUR GARMENTS ARE

3 CHECKED THOROUGHLY.  EVERYTHING WILL BE PATTED DOWN AND

4 WENT THROUGH.

5 **Q.**   WAS THAT DONE TO YOU?

6 **A.**   YES.

7 **Q.**   DID YOU HAVE ANY CONTROLLED SUBSTANCES OR DRUGS ON

8 YOUR PERSON?

9 **A.**   NO, SIR.

10 **Q.**   HAD YOU DRIVEN ANY CONTROLLED SUBSTANCES OR U. S.

11 CURRENCY OVER TO THE FBI OFFICE?

12 **A.**   NO, SIR.

13 **Q.**   AFTER THAT WAS DONE AND THAT RECORDED PHONE CALL WAS

14 PLACED, WERE YOU SHOWN ANY OTHER SORT OF PICTURES?

15 **A.**   YES.

16 **Q.**   AND WHAT WERE YOU SHOWN?

17 **A.**   I WAS SHOWN SOME SMALL INDIVIDUAL PICTURES OF OTHER

18 PEOPLE, IT WAS A GROUP OF PICTURES, WHERE I IDENTIFIED THE

19 DEFENDANT.

20 **Q.**   AND DID YOU WRITE YOUR INITIALS ON THE BACK OF IT?

21 **A.**   YES, SIR.

22 **Q.**   AFTER THAT WAS DONE, WHAT IF ANYTHING HAPPENED NEXT?

23 **A.**   AFTER THAT WAS COMPLETE, WE WENT TO THE LOCATION

24 TO -- I WAS FOLLOWED TO THE LOCATION TO MAKE THE PURCHASE.

25 **Q.**   BEFORE YOU LEFT, WERE YOU GIVEN ANY SORT OF DEVICE OR

1  ANY SORT OF THING WHERE THE POLICE COULD LISTEN TO YOU?

2  **A.**   YES.  I STILL HAD THE TRANSMITTER ON, THE TRANSMITTER

3  DEVICE.

4  **Q.**   WERE YOU TOLD WHAT YOU WERE SUPPOSED TO DO WITH THAT,

5  IF YOU WERE SUPPOSED TO KEEP IT WITH YOUR PERSON?

6  **A.**   YES, IT WAS SUPPOSED TO STAY ON YOU AT ALL TIMES.

7  **Q.**   DID YOU DO THAT?

8  **A.**   YES, SIR.

9  **Q.**   AND DID YOU HAVE ANY MONEY WITH YOU AT THAT TIME?

10  **A.**   YES.  I HAD THE MONEY THAT I WAS GIVEN BY THE AGENTS

11  TO PURCHASE THE DEUCE.

12         **MR. SEVERO:**   MAY I APPROACH, YOUR HONOR?

13  **Q.**   MR. BATTS, I'M GOING TO SHOW YOU WHAT'S PREVIOUSLY

14  BEEN INTRODUCED AS GOVERNMENT'S EXHIBIT NO. 126.  IF YOU

15  WILL LOOK AT WHAT IS IN THAT PACKAGE.  IF YOU WILL TAKE IT

16  OUT OF THE BAG AND LOOK AT IT.  (WITNESS COMPLIES WITH

17  REQUEST.)

18       WILL YOU FLIP THROUGH THAT?  DO YOU RECOGNIZE THOSE

19  ITEMS?

20  **A.**   YES, SIR.  THESE ARE THE INDIVIDUAL PICTURES THAT I

21  IDENTIFIED --

22  **Q.**   DO YOU SEE -- GO AHEAD.

23  **A.**   THESE ARE THE INDIVIDUALS PICTURES THAT I WAS SHOWN

24  THAT I ALSO IDENTIFIED DUKE OUT OF.

25  **Q.**   IS THERE ONE WHERE YOU HAVE WRITTEN SOMETHING ON?

1  **A.**   YES.  ONE HAS MY INITIALS.  IT'S GOING TO BE DUKE'S

2  NAME ON THE BACK OF THAT ALSO.

3  **Q.**   DID YOU AT SOME POINT LEAVE THE FBI OFFICE?

4  **A.**   YES, SIR.

5  **Q.**   WHERE DID YOU GO TO?

6  **A.**   WE WENT TO DUKE'S HOUSE TO MEET DUKE.

7  **Q.**   WHEN YOU SAY "WE" -- LET'S START WITH HOW DID YOU

8  LEAVE, WHAT DID YOU LEAVE IN?

9  **A.**   I LEFT IN MY VEHICLE, WHICH IS A GRAY HONDA.

10  **Q.**   WAS ANYBODY IN THE VEHICLE WITH YOU?

11  **A.**   NO, SIR.

12  **Q.**   WHEN YOU SAY "WE" LEFT, WHAT ARE YOU REFERRING TO?

13  **A.**   I WAS FOLLOWED THERE BY THE AGENTS AND TASK FORCE

14  OFFICERS.

15  **Q.**   AND WHERE DID YOU GO TO?

16  **A.**   I WENT TO DUKE'S HOUSE OFF OF HENRY.

17  **Q.**   DID YOU STOP ANYWHERE ALONG THE WAY?

18  **A.**   NO, SIR.

19  **Q.**   DID YOU FOLLOW THE TRAFFIC LAWS?

20  **A.**   YES, SIR.

21  **Q.**   DID YOU MEET WITH ANYBODY PRIOR TO GETTING TO HENRY

22  STREET?

23  **A.**   NO, SIR.

24  **Q.**   DID YOU STOP YOUR VEHICLE ON HENRY STREET?

25  **A.**   YES, SIR.

1  Q.    WHERE DID YOU STOP YOUR VEHICLE?

2  A.    IMMEDIATELY IN FRONT OF DUKE'S HOUSE.

3          **MR. SEVERO:**  YOUR HONOR, MOVE TO PUBLISH

4  GOVERNMENT'S EXHIBIT 10 BRIEFLY.

5  Q.    LOOKING AT GOVERNMENT'S EXHIBIT 10, WITH YOUR FINGER

6  CAN YOU INDICATE WHERE YOUR VEHICLE STOPPED?

7  A.    APPROXIMATELY RIGHT THERE, SIR (INDICATING).

8  Q.    AT THAT TIME WHEN YOU FIRST GOT THERE, DID YOU MEET

9  WITH ANYBODY OR TALK TO ANYONE?

10  A.    NO, SIR.

11  Q.    AT SOME POINT WHILE YOU WERE THERE, DID YOU MEET OR

12  TALK TO ANYONE?  DID YOU SEE ANY OTHER PEOPLE?  WERE OTHER

13  PEOPLE AROUND THE HOUSE?

14  A.    NO, SIR.

15  Q.    ON THE 9TH, DID YOU SEE OR SPEAK TO MANUEL ROBINSON?

16  A.    YES, SIR.  YES, SIR.  YES, SIR.

17  Q.    ALL RIGHT.  AND WHEN WAS THAT?

18  A.    THAT WAS WHEN I GOT THERE.

19  Q.    AND AT THE TIME THAT YOU WERE SPEAKING TO MANUEL

20  ROBINSON, WAS THE DEFENDANT THERE?

21  A.    NO, SIR.

22  Q.    AND AT SOME POINT -- WELL, HOW LONG DID YOU TALK TO

23  OR WERE YOU WITH MANUEL ROBINSON?

24  A.    ABOUT TEN, 15 MINUTES.

25  Q.    DURING THAT TIME, DID YOU PURCHASE OR GIVE MANUEL --

1   DID YOU PURCHASE ANY CONTROLLED SUBSTANCES FROM MANUEL

2   ROBINSON?

3   **A.**   NO, SIR.

4   **Q.**   DID YOU GIVE HIM ANY MONEY?

5   **A.**   NO, SIR.

6   **Q.**   AT SOME POINT YOU SAID YOU WERE WITH MANUEL ROBINSON

7   FOR ABOUT TEN MINUTES?

8   **A.**   TEN, 15 MINUTES, SIR.

9   **Q.**   DID MANUEL ROBINSON THEN LEAVE?

10  **A.**   YES.

11  **Q.**   DO YOU KNOW WHERE HE WENT TO OR WHAT DIRECTION HE

12  HEADED OFF IN?

13  **A.**   YES.  HE WENT HOME.

14  **Q.**   WHEN YOU SAY -- DID HE LEAVE THE AREA?

15  **A.**   LEAVE THE AREA.

16  **Q.**   HOW DID HE LEAVE?

17  **A.**   BY FOOT.

18  **Q.**   BY FOOT?

19  **A.**   YES, SIR.

20  **Q.**   AND AFTER THAT, DID YOU SEE ANY OTHER VEHICLES OR DID

21  ANY CARS COME TO HENRY STREET?

22  **A.**   YES.

23  **Q.**   AND WHAT IF ANY CARS DID YOU SEE OR WHAT IF ANY

24  VEHICLES CAME?

25  **A.**   MR. PARKER'S CAR, DUKE.

1    **Q.**   WHAT DID IT LOOK LIKE?

2    **A.**   WHITE MERCEDES.

3    **Q.**   AND WHO WAS DRIVING THE WHITE MERCEDES?

4    **A.**   HE WAS.

5    **Q.**   AND DID YOU MEET WITH MR. PARKER AT THAT TIME?

6    **A.**   YES.

7    **Q.**   WHERE DID YOU-ALL MEET?

8    **A.**   RIGHT HERE.  I WAS STILL IN THE SAME LOCATION.  HE

9    PULLED UP APPROXIMATELY HERE, RIGHT IN THIS LOCATION RIGHT

10   HERE (INDICATING).  IT WAS A SMALL GAP IN BETWEEN US.

11   **Q.**   DID EITHER OF YOU GET OUT OF YOUR CARS AT THAT TIME?

12   **A.**   YES, HE GOT OUT OF HIS CAR.

13   **Q.**   WHERE DID HE GO ONCE THE DEFENDANT GOT OUT OF HIS

14   CAR?

15   **A.**   HE ENTERED THE PASSENGER SIDE OF MY CAR.

16   **Q.**   WHAT HAPPENED THEN?

17   **A.**   DURING THAT TIME, HE SAT DOWN, HE PASSED ME THE

18   DRUGS, I GAVE HIM THE MONEY FOR THE DEUCE.

19   **Q.**   DID YOU-ALL MEET OR DID YOU HAVE A CONVERSATION

20   BEFORE THAT HAPPENED?

21   **A.**   IT WAS A SMALL CONVERSATION.

22   **Q.**   OKAY.  DID THAT SMALL CONVERSATION OCCUR BEFORE OR

23   AFTER WHAT YOU JUST DESCRIBED?

24   **A.**   BEFORE.

25   **Q.**   WHERE DID THAT SMALL CONVERSATION OCCUR?

1   **A.**   INSIDE THE CAR; INSIDE THE VEHICLE.

2   **Q.**   AFTER THAT FIRST SMALL CONVERSATION THAT YOU JUST

3   TALKED ABOUT, WHAT IF ANYTHING DID THE DEFENDANT DO RIGHT

4   AFTER THAT SMALL CONVERSATION?

5   **A.**   HE HANDED ME THE DEUCE.

6   **Q.**   DID HE, AT ANY TIME BEFORE HANDING YOU THE DEUCE, TO

7   YOUR KNOWLEDGE GO INSIDE 433 HENRY STREET?

8   **A.**   YES.  EXCUSE ME.  YES, HE DID.

9   **Q.**   IF YOU CAN DESCRIBE WHAT OCCURRED?

10  **A.**   YES.  HE CAME, GOT IN THE CAR, HE WENT INSIDE THE

11  RESIDENCE.  IT WAS A SMALL CONVERSATION, REAL SHORT.  HE

12  LEFT, WENT INSIDE THE RESIDENCE, CAME BACK OUTSIDE OF THE

13  RESIDENCE AND ENTERED THE CAR.

14  **Q.**   SO ON THIS FIRST CONVERSATION, THE FIRST TIME THAT

15  YOU-ALL MET, WAS THERE ANY CONVERSATION OR DID YOU SAY

16  ANYTHING TO HIM?

17  **A.**   IT WAS A SMALL CONVERSATION.

18  **Q.**   AT ANY TIME DID YOU HAVE A CONVERSATION OR DID YOU

19  MAKE ANY STATEMENTS ABOUT PRICE OR --

20          **MR. WALEN:**  OBJECTION, LEADING.

21          **MR. SEVERO:**  I DON'T KNOW THAT IT'S LEADING,

22  YOUR HONOR.

23          **THE COURT:**  RESTATE.

24  **BY MR. SEVERO:**

25  **Q.**   DID YOU HAVE ANY DISCUSSIONS OR ANY CONVERSATIONS

1  ABOUT MONEY OR PRICE?

2  **A.** YES. I TALKED HIM INTO SELLING ME THE DEUCE FOR

3  1,800.

4  **Q.** WHAT HAPPENED AFTER THAT CONVERSATION?

5  **A.** HE AGREED FOR 1,800. HE WENT -- HE LEFT, WENT TO THE

6  RESIDENCE AND CAME BACK.

7  **Q.** AND WHEN HE CAME BACK, WHAT HAPPENED WHEN THE

8  DEFENDANT CAME BACK?

9  **A.** HE GAVE ME THE DEUCE AND I COUNTED OUT THE MONEY TO

10 HIM, GAVE HIM THE MONEY FOR IT.

11 **Q.** AND TO YOUR KNOWLEDGE, WAS THIS THE CONVERSATION THAT

12 YOU JUST DESCRIBED THAT WERE RECORDED?

13 **A.** YES.

14 **Q.** AND DURING THE TIME PERIOD THAT HE LEFT YOUR CAR, HAD

15 YOU RECEIVED A PHONE CALL FROM ANYONE?

16 **A.** YES.

17 **Q.** WHO DID YOU RECEIVE A PHONE CALL FROM?

18 **A.** THE AGENT.

19 **Q.** DID YOU SPEAK WITH HIM?

20 **A.** YES.

21 **Q.** WHAT DID YOU TELL THEM?

22 **A.** BASICALLY I WAS ALL RIGHT. BASICALLY I RECALL

23 TELLING THEM THAT I WAS OKAY, EVERYTHING WAS OKAY.

24 **Q.** HAVE YOU HAD AN OCCASION TO LISTEN TO THE RECORDING

25 OF THE BODY WIRE?

1  **A.**   YES.

2  **Q.**   AND DOES IT FAIRLY AND ACCURATELY REFLECT THE WORDS

3  THAT YOU SAID ON NOVEMBER 9, 2009?

4  **A.**   YES.

5  **Q.**   HAVE YOU HAD AN OCCASION -- DOES IT FAIRLY AND

6  ACCURATELY REFLECT THE WORDS THAT OTHER PEOPLE SAID TO

7  YOU?

8  **A.**   SAY THAT AGAIN, SIR?

9  **Q.**   ARE THE WORDS -- IF ANY WORDS WERE SAID TO YOU, DOES

10  IT SHOW OR DOES IT HAVE THE EXACT WORDS THAT WERE SAID TO

11  YOU?

12  **A.**   YES, SIR.

13  **Q.**   HAVE YOU HAD AN OCCASION TO LOOK AT A TRANSCRIPT OR

14  HELP PREPARE A TRANSCRIPT OF THOSE WORDS?

15  **A.**   YES, SIR.

16  **Q.**   DOES THAT TRANSCRIPT FAIRLY AND ACCURATELY SHOW OR

17  REFLECT THE WORDS THAT YOU SAID?

18  **A.**   YES, SIR.

19  **Q.**   AND HAS THAT DISK BEEN PLAYED FOR YOU AND DID YOU

20  WRITE YOUR NAME ON THE DISK?

21  **A.**   YES, SIR.

22         **MR. SEVERO:**  MAY I APPROACH THE WITNESS, YOUR

23  HONOR?

24         **THE COURT:**  YOU MAY.

25  **BY MR. SEVERO:**

1    **Q.**   I'LL SHOW YOU FIRST, MR. BATTS, WHAT'S MARKED AS

2    GOVERNMENT'S EXHIBIT NO. 22 AND ASK YOU TO LOOK AT THAT

3    AND ASK YOU IF YOU RECOGNIZE THAT?

4    **A.**   YES, SIR.

5    **Q.**   WHAT IS THAT?

6    **A.**   THIS IS THE DISK THAT I SIGNED WITH MY INITIALS AND

7    DATED IT.

8    **Q.**   HAVE YOU LISTENED TO THAT DISK?

9    **A.**   YES.

10   **Q.**   DID YOU LISTEN TO IT BEFORE YOU SIGNED IT AND

11   INITIALED IT?

12   **A.**   YES.

13   **Q.**   DOES THAT DISK ACCURATELY REFLECT THE WORDS THAT YOU

14   SAID AND WERE SAID TO YOU ON NOVEMBER 9, 2009, THROUGH THE

15   BODY WIRE?

16   **A.**   YES, SIR.

17   **Q.**   I'LL SHOW YOU WHAT'S PREVIOUSLY INTRODUCED AS

18   GOVERNMENT'S EXHIBIT NO. 21.  ASK YOU IF YOUR RECOGNIZE

19   THAT?

20   **A.**   YES, SIR.

21   **Q.**   WHAT IS THAT?

22   **A.**   THIS IS THE RECORDED CONVERSATION THAT I SIGNED OFF.

23   **Q.**   IS IT IN WRITING?  IS IT A WRITTEN PORTION OF THE

24   RECORDED CONVERSATION?

25   **A.**   YES, SIR.

1  **Q.**   DID YOU SIGN AND WRITE DOWN ON THE PAGES AFTER

2  LISTENING TO IT?

3  **A.**   YES, SIR.

4  **Q.**   AND DOES IT FAIRLY AND ACCURATELY REFLECT THE WORDS

5  THAT YOU SAID AND THE WORDS THAT WERE SAID TO YOU?

6  **A.**   YES, SIR.

7          **MR. SEVERO:**  YOUR HONOR, I WOULD MOVE TO PUBLISH

8  A PORTION OF GOVERNMENT'S EXHIBIT NO. 22.  IN A MOMENT

9  I'LL SAY FOR THE RECORD WHICH PORTION THAT IS.

10         **THE COURT:**  SO ORDERED.

11         **MR. SEVERO:**  YOUR HONOR, THIS IS 28:45.

12     (AUDIO TAPE PLAYED FOR THE JURY.)

13  **BY MR. SEVERO:**

14  **Q.**   WHOSE VOICES ARE REFLECTED ON THAT PORTION OF THE

15  CONVERSATION?

16  **A.**   THAT'S MY VOICE AND DUKE.

17  **Q.**   AND WHAT WERE YOU REFERRING TO WHEN YOU SAID, "CAN I

18  GET IT FOR THE 18?"

19  **A.**   THE DEUCE OF COCAINE BASE.

20  **Q.**   OKAY.  WHAT IS THE 18?  WHAT DO YOU MEAN WHEN YOU

21  SAID THOSE WORDS, WHAT'S THAT?

22  **A.**   EIGHTEEN WAS SHORT FOR 1,800.

23  **Q.**   1,800 WHAT?

24  **A.**   $1,800.

25  **Q.**   AND WHAT IF ANY RESPONSE DID MR. PARKER, THE

1   DEFENDANT, GIVE?

2   **A.**   YEAH.

3   **Q.**   WAS IT AT THAT TIME THAT HE LEFT YOUR VEHICLE?

4   **A.**   YES.

5   **Q.**   AFTER THAT, DID YOU GET -- YOU SAID YOU GOT A PHONE

6   CALL FROM THE AGENT?

7   **A.**   YES.

8          **MR. SEVERO:**   YOUR HONOR, I WILL NOW PLAY FROM

9   THE 30:07 MINUTE MARK.

10         (AUDIO TAPE PLAYED FOR THE JURY.)

11  **BY MR. SEVERO:**

12  **Q.**   WHEN YOU SAID -- WHOSE VOICE WAS THAT ON THE RECORDED

13  WIRE?

14  **A.**   THAT WAS MY VOICE.

15  **Q.**   AND WHEN YOU SAID, "I TALKED HIM DOWN," WHAT DID YOU

16  MEAN?

17  **A.**   I TALKED HIM DOWN TO 1,800.

18  **Q.**   AND WHEN YOU SAID, "HE'S GOING IN THE HOUSE," WHAT

19  DID YOU MEAN BY THAT?

20  **A.**   THAT HE EXITED THE VEHICLE AND WENT INTO HIS

21  RESIDENCE.

22  **Q.**   DID YOU SEE THE DEFENDANT AFTER THAT?  DID YOU SEE

23  MR. PARKER AFTER THAT PORTION OF THE CONVERSATION WE JUST

24  HEARD?

25  **A.**   NO.  HE WENT INTO THE RESIDENCE.

**Q.** DID HE COME BACK OUT?

**A.** YES, HE CAME BACK OUT.

**Q.** DID YOU MEET WITH HIM AFTER THAT?

**A.** YES.

**Q.** AND IS THAT WHEN THIS EXCHANGE TOOK PLACE?

**A.** YES.

**MR. SEVERO:** YOUR HONOR, I WOULD THEN PLAY FROM THE 41:47 POINT.

**THE COURT:** OKAY.

(AUDIO TAPE PLAYED FOR THE JURY.)

**BY MR. SEVERO:**

**Q.** WHEN YOU SAY SKEET -- WHOSE VOICES ARE ON THAT PORTION OF THE RECORDING?

**A.** THAT'S MINE AND DUKE.

**Q.** WHAT DID YOU MEAN WHEN YOU SAID, "SKEET JUSTLY LEFT" OR "SKEET LEFT THE AREA"?

**A.** THAT'S WHO I WAS TALKING TO WHEN I FIRST CAME TO THAT LOCATION.

**Q.** AND WHEN YOU SAID, "IS IT BUTTER," WHAT, IF ANYTHING, WERE YOU REFERRING TO?

**A.** THE COCAINE BASE, WAS IT GOOD. IT'S ANOTHER WORD FOR GOOD.

**Q.** WHAT IF ANYTHING HAPPENED AFTER THIS PORTION OF THE CONVERSATION?

**A.** I WAS GIVEN THE DEUCE AND THEN I GAVE HIM THE MONEY.

1     **MR. SEVERO:**  YOUR HONOR, I WOULD THEN PLAY THE

2     42:32 PORTION OF THE TAPE.

3              **THE COURT:**  ALL RIGHT, SIR.

4        (AUDIO TAPE PLAYED FOR THE JURY.)

5     **BY MR. SEVERO:**

6     **Q.**   WHOSE VOICES ARE CAPTURED ON THAT PORTION OF THE

7     WIRE?

8     **A.**   MINE AND DUKE.

9     **Q.**   AND WHEN YOU SAID THE WORD "STACK", WHAT DID YOU MEAN

10    BY THAT?

11    **A.**   A THOUSAND DOLLARS.

12    **Q.**   AND HAD THE DEFENDANT ALREADY GIVEN YOU THE DEUCE AT

13    THE TIME YOU WERE COUNTING THE MONEY?

14    **A.**   YES.

15    **Q.**   NOW, WAS THERE -- WHAT DID YOU MEAN OR WHAT WAS MEANT

16    WITH A PORTION OF THE CONVERSATION THAT TALKED ABOUT FAKE

17    MONEY?

18    **A.**   I THINK HE ASKED ME WAS IT REAL.  HE ASKED ME

19    SOMETHING, WAS IT REAL, SOMETHING TO THAT SORT, THAT I CAN

20    RECALL.

21    **Q.**   WAS THERE -- WHY WOULD THERE BE A CONVERSATION ABOUT

22    THE MONEY BEING REAL, IF YOU KNOW?

23    **A.**   I HAVE NO IDEA.

24    **Q.**   AND WHAT IF ANYTHING DID YOU DO AFTER THE DEAL?

25    **A.**   I CALLED, "END OF DEAL."

**Q.** WHAT DID YOU DO AFTER THAT?

**A.** PLACED A CALL TO THE AGENTS.

**Q.** WHAT DID YOU DO THEN?

**A.** I WAS DIRECTED TO GO TO A CERTAIN LOCATION.

**Q.** DID YOU GO TO THAT LOCATION?

**A.** YES, SIR.

**Q.** DO YOU KNOW WHERE THAT WAS?

**A.** THE FLEA MARKET.

**Q.** DID YOU STOP ANYWHERE ALONG THE WAY?

**A.** NO, SIR.

**Q.** DID YOU MEET WITH ANYONE?

**A.** NO, SIR.

**Q.** DID YOU PICK UP ANYTHING OR GIVE ANYTHING TO ANYONE?

**A.** NO, SIR.

**Q.** WHEN YOU GOT TO THE FLEA MARKET, DID YOU MEET WITH ANYONE?

**A.** YES.

**Q.** WHO DID YOU MEET WITH?

**A.** THE AGENTS.

**Q.** WHEN YOU MET WITH THE AGENTS, DID YOU GIVE THEM ANYTHING?

**A.** YES.

**Q.** TELL THE MEMBERS OF THE JURY WHAT YOU GAVE THEM.

**A.** I GAVE THEM THE $200 THAT WAS REMAINING ALONG WITH THE TWO OUNCES OF CRACK COCAINE BASE, THE DEUCE, AND THE

1   RECORDER.

2   **Q.**   AFTER THAT, WERE YOU SEARCHED?

3   **A.**   YES.

4   **Q.**   AND HOW WERE YOU SEARCHED?

5   **A.**   I WAS THOROUGHLY SEARCHED AGAIN, TOP TO BOTTOM.  THE

6   REMOVAL OF THE GARMENTS, TOP TO BOTTOM SEARCH, AND THE

7   VEHICLE WAS SEARCHED AGAIN.

8   **Q.**   DID YOU HAVE ANY CONTROLLED SUBSTANCES OR CURRENCY ON

9   YOUR PERSON?

10  **A.**   NO, SIR.

11  **Q.**   AND DID YOU TALK TO THE OFFICERS OR TELL THEM WHAT

12  HAD HAPPENED?

13  **A.**   YES.

14  **Q.**   DID YOU -- WERE YOU GIVEN ANYTHING BY ANY OF THE

15  OFFICERS THAT EVENING AFTER THAT?

16  **A.**   YES, SIR.

17  **Q.**   AND WHAT WAS THAT?

18  **A.**   $200.

19  **Q.**   DID YOU LEAVE AFTER THAT?

20  **A.**   YES, SIR.

21  **Q.**   TURNING YOUR ATTENTION OR DIRECTING YOUR ATTENTION TO

22  NOVEMBER 30 OF 2009.  DID YOU RECEIVE A PHONE CALL OR DID

23  YOU RECEIVE A PHONE CALL FROM ANYBODY ON THAT DAY?

24  **A.**   THE 30TH, YES.

25  **Q.**   WHO DID YOU RECEIVE A PHONE CALL FROM?

**A.**   DUKE.

**Q.**   PRIOR TO THAT, HAD YOU GIVEN -- DID YOU GIVE YOUR PHONE NUMBER TO ANYBODY TO GIVE TO DUKE?

**A.**   YES.

**Q.**   AND WHY WAS THAT?

**A.**   I CAME TO -- I TRIED TO PLACE A CALL TO HIS PHONE. HIS PHONE WAS CHANGED OR OFF.  I LEFT MY PHONE NUMBER THERE AT HIS RESIDENCE TO HAVE HIM GIVE ME A CALL.

**Q.**   HAVE YOU EVER BEEN INSIDE OF 433 HENRY STREET?

**A.**   NO, SIR.

**Q.**   ON THE 30TH OF NOVEMBER, 2009, AT SOME POINT DID YOU GET A PHONE CALL FROM THE DEFENDANT?

**A.**   YES.

**Q.**   DID YOU-ALL TALK?

**A.**   YES.

**Q.**   WHAT WAS -- TELL THE JURY ABOUT THAT CONVERSATION.

**A.**   THAT CONVERSATION WAS FOR THE PURCHASE OF JUST REGULAR COCAINE, WHICH WOULD BE REFERRED AS GIRL.

**Q.**   WAS THERE A DISCUSSION AT THAT TIME ABOUT AN AMOUNT?

**A.**   I BELIEVE IT WAS AN OUNCE.

**Q.**   DOES AN OUNCE HAVE OR ARE YOU FAMILIAR WITH ANY TERM OR STREET TERM RELATED TO AN OUNCE?

**A.**   A HOLE, OR GIRL.

**Q.**   ARE YOU FAMILIAR WITH ANY OTHER TERMS RELATED TO THE WORD "OUNCE"?  HAVE YOU EVER HEARD OF THE TERM "ONION"?

1    **A.**   ONION, THAT'S CORRECT.

2    **Q.**   HAVE YOU HEARD OF THE TERM ONION?

3    **A.**   YES.

4    **Q.**   YOU HEARD OF THE TERM LIKE THAT.  WHAT DOES IT MEAN?

5    **A.**   AN ONION MEANS AN OUNCE OF ANYTHING.

6    **Q.**   AFTER THIS CONVERSATION WITH THE DEFENDANT, DID YOU

7    HAVE A CONVERSATION WITH ANYONE ELSE?

8    **A.**   YES.  I LET THE AGENTS KNOW THAT I HAD TOUCHED BASE

9    WITH DUKE AND WE DISCUSSED THE PURCHASE OF AN ONION, A

10   GIRL, WHICH IS COCAINE.

11   **Q.**   WERE YOU DIRECTLY TOLD TO MEET WITH ANYBODY AT THAT

12   TIME?

13   **A.**   I MET WITH THE AGENTS.

14   **Q.**   ON NOVEMBER 30, WERE YOU TOLD AT THAT TIME TO MEET

15   WITH ANYBODY?

16   **A.**   NO.

17   **Q.**   DID YOU MEET -- DID YOU MEET WITH ANYBODY ON

18   DECEMBER 1 OF 2009?

19   **A.**   YES.

20   **Q.**   WHO DID YOU MEET WITH?

21   **A.**   I MET WITH THE AGENTS.

22   **Q.**   WHERE DID YOU MEET WITH THEM?

23   **A.**   FBI LOCATION.

24   **Q.**   HOW DID YOU GET THERE?

25   **A.**   I DROVE THERE.

**Q.** WHAT DID YOU DRIVE?

**A.** GRAY HONDA.

**Q.** WHAT DID YOU DO ONCE YOU GOT THERE WITH THE GRAY

HONDA?

**A.** IMMEDIATELY I PASSED OVER MY KEYS, THE VEHICLE WAS

SEARCHED. I WAS SEARCHED. I REMOVED ALL GARMENTS. I WAS

THOROUGHLY SEARCHED FROM TOP TO BOTTOM, UNDER THE GROIN,

BUTTOCKS AREA; FROM THE TOP ALL THE WAY TO THE BOTTOM.

**Q.** WHERE DID THAT SEARCH TAKE PLACE?

**A.** FBI LOCATION.

**Q.** DID YOU HAVE ANY CONTROLLED SUBSTANCES ON YOUR

PERSON?

**A.** NO, SIR.

**Q.** DID YOU HAVE ANY MONEY ON YOUR PERSON?

**A.** NO, SIR.

**Q.** DID YOU BRING OR DRIVE ANY CONTROLLED SUBSTANCES OR

MONEY TO THE FBI OFFICE IN YOUR CAR?

**A.** NO, SIR.

**Q.** WERE YOU DIRECTED TO OR DID YOU PLACE A PHONE CALL ON

DECEMBER 1, 2009?

**A.** EXCUSE ME. I PLACED A PHONE CALL, SIR.

**Q.** AND WHO DID YOU CALL?

**A.** DUKE.

**Q.** WAS IT AT THE SAME NUMBER THAT YOU CALLED ON

NOVEMBER 9 OF 2009?

**A.**   IT WAS A NEW NUMBER.

**Q.**   AND DID YOU IN FACT DIAL OR MAKE THE PHONE CALL?

**A.**   YES.

**Q.**   DID SOMEONE ANSWER THE PHONE?

**A.**   YES.

**Q.**   WHO ANSWERED THE PHONE?

**A.**   DUKE.

**Q.**   DID YOU SPEAK WITH HIM?

**A.**   YES.

**Q.**   ARE YOU AWARE OR DO YOU KNOW IF THAT PHONE CALL WAS RECORDED?

**A.**   YES.

**Q.**   HAVE YOU HAD AN OCCASION TO LISTEN TO THAT PHONE CALL SINCE YOU PLACED IT?

**A.**   YES.

**Q.**   AND DOES THE PHONE CALL THAT YOU LISTENED TO OR THE RECORDING THAT YOU LISTENED TO, IS IT THE SAME WORDS THAT WERE SPOKEN AND SAID TO YOU AS ON DECEMBER 1, 2009?

**A.**   YES, SIR.

**Q.**   HAVE YOU HAD AN OCCASION TO LOOK AT A TRANSCRIPT OF THAT PHONE CALL?

**A.**   YES, SIR.

**Q.**   DID YOU HELP IN THE PREPARATION OF THAT TRANSCRIPT?

**A.**   YES.

**Q.**   AND HAVE YOU COMPARED THE WORDS FROM THE RECORDING

1  WITH THAT TRANSCRIPT?

2  **A.**   YES, SIR.

3  **Q.**   AND DOES THE TRANSCRIPT FAIRLY SHOW THE WORDS THAT

4  YOU SAID AND THAT WERE SPOKEN TO YOU ON DECEMBER 1, 2009?

5  **A.**   YES, SIR.

6           **MR. SEVERO:**  MAY I APPROACH, YOUR HONOR?

7           **THE COURT:**  YOU MAY.

8  **BY MR. SEVERO:**

9  **Q.**   FIRST I'LL APPROACH WITH WHAT'S BEEN PREVIOUSLY

10  INTRODUCED AS GOVERNMENT'S EXHIBIT NO. 27 AND ASK YOU TO

11  LOOK AT THAT AND ASK YOU IF YOU RECOGNIZE THAT?

12  **A.**   YES, SIR.

13  **Q.**   WHAT IS THAT?

14  **A.**   THAT'S THE DISK OF THE CONVERSATION THAT I INITIALED.

15           **MR. SEVERO:**  MAY I APPROACH, YOUR HONOR?

16           **THE COURT:**  YOU MAY.

17  **BY MR. SEVERO:**

18  **Q.**   I'LL SHOW YOU A COPY OF WHAT'S PREVIOUSLY BEEN

19  INTRODUCED AS GOVERNMENT'S EXHIBIT NO. 28.  ASK YOU TO

20  LOOK AT THAT.  DO YOU RECOGNIZE THAT?

21  **A.**   YES, SIR.

22  **Q.**   IS THAT THE TRANSCRIPT THAT YOU HELPED PREPARE?

23  **A.**   YES, SIR.

24           **MR. SEVERO:**  YOUR HONOR, I WOULD MOVE TO

25  RE-PUBLISH GOVERNMENT'S EXHIBIT NO. 27.

1          **THE COURT:**  LET IT BE DONE.

2          (AUDIO TAPE PLAYED FOR THE JURY.)

3     **BY MR. SEVERO:**

4     **Q.**   AFTER THE PORTION, THE FIRST VOICE, WHO ARE THE OTHER

5     TWO VOICES ON THE RECORDED PHONE CALL?

6     **A.**   EXCUSE ME, SIR?

7     **Q.**   WHO ARE THE VOICES ON THAT RECORDED PHONE CALL?

8     **A.**   ME AND DUKE.

9     **Q.**   IS THERE ALSO AN OFFICER ON THAT?

10    **A.**   YES.

11    **Q.**   AND AT THIS PORTION WHEN YOU SAID, "WHAT'S UP DUKE",

12    WHO ARE YOU REFERRING TO?

13    **A.**   THE DEFENDANT.

14    **Q.**   AND WHEN YOU SAID, "I GOT THE HONDA", WHAT WERE YOU

15    REFERRING TO?

16    **A.**   THE CAR I WAS DRIVING.

17    **Q.**   AND WHEN YOU SAID, "YOU JUST CALLED ME LAST NIGHT",

18    WHAT WERE YOU REFERRING TO?

19    **A.**   THE PHONE CONVERSATION ME AND DUKE HAD.

20    **Q.**   AND THEN WHEN YOU SAID, "YOU STILL GOOD WITH THAT BOY

21    BOY", WHAT WERE YOU REFERRING TO?

22    **A.**   CRACK.

23    **Q.**   AND WAS THERE -- WHAT DID YOU TAKE THE DEFENDANT TO

24    MEAN WHEN HE SAID, "I AIN'T GOT THE GIRL"?

25    **A.**   WE HAD DISCUSSED COCAINE, ONIONS, WHICH IS AN OUNCE

1   OF COCAINE.

2   **Q.**   AND COCAINE BEING DIFFERENT THAN CRACK COCAINE?

3   **A.**   YES.

4   **Q.**   AND WHEN YOU SAID, "WHAT THE NUMBERS LOOK LIKE", WHAT

5   WERE YOU REFERRING TO?

6   **A.**   THE PRICE.

7   **Q.**   AND WHEN YOU SAID, "PROBABLY LIKE AN ONION", WHAT

8   WERE YOU REFERRING TO?

9   **A.**   AN OUNCE.

10   **Q.**   AND WHEN YOU SAID, "DO IT FOR THE NINE", WHAT WERE

11   YOU REFERRING TO?

12   **A.**   900.

13   **Q.**   HOW DID YOU ARRIVE AT THAT FIGURE?

14   **A.**   THE FIRST PURCHASE THAT WE MADE I TALKED HIM DOWN TO

15   18. I THOUGHT IT WOULD ONLY BE FAIR TO DO IT AT HALF OF

16   THAT, THAT PRICE.

17   **Q.**   AND WHAT DID YOU TAKE TO MEAN WHEN HE SAID, "YEAH,

18   YOU CAN GET IT FOR THAT, YEAH"?

19   **A.**   HE AGREED TO 900.

20   **Q.**   AND THEN WHAT DID YOU MEAN WHEN YOU SAID, "LET ME GET

21   IT FOR THE NINE"?

22   **A.**   I MEANT 900.

23   **Q.**   DID YOU CONTINUE THE PHONE CONVERSATION AFTER THAT?

24   **A.**   YES.

25      (AUDIO TAPE RESUMES BEING PLAYED.)

1    **BY MR. SEVERO:**

2    **Q.**    WHAT WAS THE NATURE OF THAT PORTION OF THE PHONE

3    CALL?

4    **A.**    IT WAS A COMMOTION.  I DIDN'T KNOW WHAT HAD HAPPENED.

5    I JUST WANTED TO MAKE SURE HE WAS ALL RIGHT SO I PLACED

6    THE CALL BACK TO MAKE SURE EVERYTHING WAS ALL RIGHT WITH

7    HIM.

8    **Q.**    WHO ARE YOU TALKING TO AT THAT TIME, THAT WAS ON THE

9    PHONE?

10   **A.**    DUKE.

11            **MR. SEVERO:**  YOUR HONOR, MAY I APPROACH?

12            **THE COURT:**  YOU MAY.

13   **BY MR. SEVERO:**

14   **Q.**    AFTER THAT PHONE CONVERSATION, WERE YOU GIVEN

15   ANYTHING BY THE OFFICERS?

16   **A.**    YES.

17   **Q.**    AND WHAT WERE YOU GIVEN?

18   **A.**    I WAS GIVEN THE MONEY AND THE TRANSMITTER.

19   **Q.**    HOW MUCH MONEY WERE YOU GIVEN?

20   **A.**    900.

21   **Q.**    900 WHAT?

22   **A.**    $900.

23   **Q.**    DO YOU KNOW IF ANYTHING WAS PLACED IN YOUR

24   AUTOMOBILE?

25   **A.**    YES.

1  **Q.**   AND WHAT WAS PLACED IN YOUR AUTOMOBILE?

2  **A.**   RECORDING DEVICE.  A CAMERA RECORDING DEVICE.

3  **Q.**   AND AFTER THAT WAS DONE, WHAT DID YOU DO NEXT OR WHAT

4  DID YOU DO?

5  **A.**   I PROCEEDED TO DUKE'S HOUSE.

6  **Q.**   AND WHAT DID YOU LEAVE IN?

7  **A.**   THE HONDA.

8  **Q.**   AND DID YOU STOP ANYWHERE BEFORE HEADING TO DUKE'S

9  HOUSE?

10  **A.**   NO, SIR.

11  **Q.**   DID YOU EVER ARRIVE AT THE PERSON YOU KNOW TO BE

12  DUKE'S HOUSE?

13  **A.**   YES.

14  **Q.**   IS THAT ON HENRY STREET?

15  **A.**   YES, SIR.

16  **Q.**   IS THAT IN WILMINGTON, NORTH CAROLINA?

17  **A.**   YES, SIR.

18  **Q.**   DID YOU SEE OR MEET WITH -- DID YOU SEE ANYONE OR DID

19  YOU EVER MAKE IT TO HENRY STREET?

20  **A.**   YES.

21  **Q.**   WHEN YOU GOT TO HENRY STREET, DID YOU SEE ANYONE?

22  **A.**   YES.

23  **Q.**   WHO DID YOU SEE?

24  **A.**   I MET WITH DUKE.

25  **Q.**   SO YOU SAW HIM?

1  **A.**   YES.

2  **Q.**   WERE THERE ANY -- WHERE DID THAT TAKE PLACE OR WHERE

3  DID YOU SEE HIM?

4  **A.**   AT THE FRONT OF HIS HOUSE.

5  **Q.**   AND DID YOU SEE ANY CARS?

6  **A.**   HIS CAR.

7  **Q.**   WHICH CAR WAS THAT?

8  **A.**   THE WHITE MERCEDES.

9  **Q.**   WHAT HAPPENED NEXT?

10  **A.**   HE ENTERED MY VEHICLE THAT DAY, HE HANDED ME THE

11  OUNCE OF CRACK COCAINE.

12  **Q.**   DID HE HAND YOU SOMETHING?

13  **A.**   YES.

14  **Q.**   DID YOU TAKE WHAT HE HANDED YOU?

15  **A.**   YES.

16  **Q.**   DID YOU GIVE HIM ANYTHING?

17  **A.**   YES.

18  **Q.**   WHAT DID YOU DO WITH THE THING YOU GAVE HIM?  DID YOU

19  DO ANYTHING WITH THE THING BEFORE YOU GAVE IT TO HIM?

20  **A.**   I JUST HELD ONTO IT.

21  **Q.**   OKAY.  YOU INDICATED YOU GAVE HIM SOMETHING?

22  **A.**   YES.  I GAVE HIM THE MONEY.

23  **Q.**   DID YOU DO ANYTHING WITH THE MONEY BEFORE YOU GAVE IT

24  TO HIM?

25  **A.**   COUNTED IT OUT.

1   **Q.**   WHAT HAPPENED AFTER THAT?

2   **A.**   AFTER THAT, HE SHOWED ME A LARGE AMOUNT OF MONEY.

3   **Q.**   DID YOU MAKE ANY COMMENTS OR SAY ANYTHING ABOUT THAT?

4   **A.**   YES.  I TOLD HIM IT WAS A LOT OF MONEY.

5   **Q.**   WHAT IF ANYTHING HAPPENED AFTER THAT?

6   **A.**   HE EXITED THE VEHICLE.

7   **Q.**   WHAT IF ANYTHING HAPPENED AFTER THAT?

8   **A.**   I LOST MY PHONE.

9   **Q.**   DID YOU DO ANYTHING WITH YOUR PHONE OR DID YOU TRY TO

10  FIND IT?

11  **A.**   I TRIED TO FIND IT.

12  **Q.**   DID YOU FIND IT?

13  **A.**   YES.

14  **Q.**   DO YOU KNOW WHERE THE DEFENDANT WAS WHEN YOU WERE

15  LOOKING FOR YOUR PHONE?

16  **A.**   YES.  HE WAS AT THE REAR TRUNK OF HIS VEHICLE.

17  **Q.**   WAS ANYBODY ELSE IN THE AREA BESIDES YOU AND HIM WHEN

18  YOU WERE LOOKING FOR YOUR PHONE?

19  **A.**   NO, SIR.

20  **Q.**   HAVE YOU HAD -- SINCE THIS OCCURRED, HAVE YOU LOOKED

21  AT OR BEEN SHOWN A VIDEOTAPE OF WHAT OCCURRED?

22  **A.**   YES, SIR.

23  **Q.**   HAVE YOU REVIEWED THAT?

24  **A.**   YES, SIR.

25  **Q.**   DOES IT SHOW SOME OF THE THINGS THAT HAPPENED IN YOUR

1  CAR?

2  **A.**   YES, SIR.

3  **Q.**   AND DOES IT -- I'LL SHOW YOU WHAT'S MARKED

4  GOVERNMENT'S EXHIBIT NO. 29 AND ASK YOU TO LOOK AT THAT

5  AND ASK YOU IF YOU RECOGNIZE THAT?

6  **A.**   YES, SIR.

7  **Q.**   HOW DO YOU RECOGNIZE IT?

8  **A.**   I INITIALED THE DISK AFTER REVIEWING IT.

9        **MR. SEVERO:**  YOUR HONOR, I WOULD MOVE TO

10  RE-PUBLISH 29.

11        **THE COURT:**  ALL RIGHT.  ONE MORE TIME.

12     (VIDEOTAPE PLAYED FOR THE JURY.)

13  **BY MR. SEVERO:**

14  **Q.**   AT THIS TIME WHEN YOU WATCHED GOVERNMENT'S

15  EXHIBIT 29, CAN YOU SHOW OR EXPLAIN TO THE MEMBERS OF THE

16  JURY WHEN THE TRANSFER THAT YOU DESCRIBED, WHEN YOU

17  RECEIVED THE ITEM FROM THE DEFENDANT?

18  **A.**   YES.

19     (VIDEOTAPE REPLAYED FOR THE JURY.)

20     RIGHT THERE.  HE HANDED IT TO ME.  HE ALREADY HANDED

21  IT TO ME.

22  **Q.**   OKAY.  WE'LL GO BACK.

23     (VIDEOTAPE REPLAYED FOR THE JURY.)

24  **A.**   RIGHT THERE.  HE JUST HANDED IT TO ME.

25  **Q.**   WHICH HAND DID HE USE TO HAND IT TO YOU?

**A.**   HIS LEFT HAND.

**Q.**   WHAT DID YOU DO WITH IT WHEN YOU RECEIVED IT?

**A.**   I KEPT IT IN MY HAND.

**Q.**   AND WHAT DID YOU DO AFTER RECEIVING THAT ITEM AND GIVING THE MONEY TO THE DEFENDANT; WHAT DID YOU DO THEN?

**A.**   I LOOKED FOR MY CELL PHONE.

**Q.**   WHAT DID YOU DO AFTER THAT?  ONCE YOU FOUND YOUR CELL PHONE, WHAT DID YOU DO THEN?

**A.**   I PLACED THE CALL TO THE AGENTS.  I LEFT HIS RESIDENCE, I WENT TO THE INTERSECTION, MADE A LEFT, MADE ANOTHER LEFT, WENT BACK TO PRINCESS PLACE AND PROCEEDED IN THE DIRECTION I WAS TOLD TO GO.

**Q.**   DID YOU MEET WITH OR SPEAK WITH ANYBODY OR RECEIVE ANY CONTROLLED SUBSTANCES DURING ANY OF THAT TIME?

**A.**   NO.

**Q.**   WHERE DID YOU GO TO?

**A.**   I MET AT THE FLEA MARKET.

**Q.**   WHO DID YOU MEET WITH?

**A.**   THE AGENTS.

**Q.**   WHAT IF ANYTHING DID YOU GIVE TO THE AGENTS?

**A.**   I GAVE THEM THE DRUGS AND THE BODY TRANSMITTER.

**Q.**   YOU GAVE THEM THE ITEM THAT YOU RECEIVED FROM THE DEFENDANT?

**A.**   YES.

**Q.**   AND DID YOU -- YOU SAID YOU GAVE THEM THE BODY

1    TRANSMITTER?

2    **A.**    YES.

3    **Q.**    WERE YOU STRIP SEARCHED?

4    **A.**    YES, SIR.

5    **Q.**    WAS ANYTHING FOUND ON YOUR PERSON?

6    **A.**    NO, SIR.

7    **Q.**    WAS YOUR VEHICLE SEARCHED?

8    **A.**    YES, SIR.

9    **Q.**    AND DID YOU -- WERE YOU GIVEN ANYTHING BY THE AGENTS

10   AFTER THIS?

11   **A.**    I THINK I MIGHT HAVE BEEN GIVEN A HUNDRED DOLLARS.

12   **Q.**    AND AFTER THAT, AFTER YOUR VEHICLE WAS SEARCHED, WERE

13   YOU ALLOWED TO LEAVE?

14   **A.**    YES.

15          **MR. SEVERO:**  MAY I HAVE JUST ONE MOMENT, YOUR

16   HONOR?

17          **THE COURT:**  YES.

18      (PAUSE IN THE PROCEEDINGS.)

19          **MR. SEVERO:**  TENDER THE WITNESS, YOUR HONOR.

20          **THE COURT:**  ALL RIGHT, MR. WALEN.  WILL THE

21   DEFENDANT HAVE QUESTIONS OF MR. BATTS?

22          **MR. WALEN:**  I WILL HAVE A FEW, YOUR HONOR.

23          **THE COURT:**  ALL RIGHT.  WELL, LET'S TAKE THE

24   AFTERNOON RECESS.

25      MEMBERS OF THE JURY, CLOSE YOUR NOTEBOOKS AND WE'LL

1    LET YOU HAVE A 15-MINUTE RECESS.  THEN WE'LL COME BACK

2    UNTIL 4 O'CLOCK.  EVERYONE ELSE REMAIN SEATED.  MEMBERS OF

3    THE JURY, YOU MAY GO TO YOUR JURY ROOM.

4        (RECESS TAKEN.)

5            **THE COURT:**  ALL RIGHT, BRING THE JURY IN.

6            **MR. WALEN:**  YOUR HONOR?

7            **THE COURT:**  HOLD IT A SECOND.

8            **MR. WALEN:**  YOUR HONOR, MY CLIENT JUST INFORMED

9    ME HE NEEDS TO ADDRESS THE COURT FOR SOME REASON.

10           **THE COURT:**  I'LL HEAR HIM LATER.  WELL, I'LL

11   HEAR HIM RIGHT NOW.  WHAT'S ON YOUR MIND?

12           **THE DEFENDANT:**  YOUR HONOR, I'M FACING A LOT OF

13   TIME.  THIS IS MY LIFE RIGHT HERE.  HE'S TELLING ME HE'S

14   NOT GOING TO CROSS-EXAMINE ALL THE CHANGES.  HE CHANGED

15   HIS STORY UP TWO TIMES.  MY CONSTITUTIONAL RIGHTS, IF YOU

16   WANT ME TO READ ALL OF THIS.  HE'S NOT SHOWING THAT HE'S

17   TRYING TO WORK FOR ME.

18           **THE COURT:**  WHAT IS IT YOU WANT HIM TO QUESTION

19   THIS WITNESS ABOUT?

20           **THE DEFENDANT:**  HE CHANGED HIS STORY UP TWICE ON

21   TWO DIFFERENT SEPARATE OCCASIONS.

22           **THE COURT:**  HAVE YOU GOT ANY PAST TRANSCRIPTS

23   WHERE HE SAID SOMETHING DIFFERENT THAN HE SAID HERE TODAY?

24           **THE DEFENDANT:**  YES, SIR.  HE TOLD THE JURY THAT

25   HE PURCHASED COCAINE FROM ME, POWDER.  NOW HE'S SAYING

1  CRACK.  HE SAID HE PURCHASED GIRL.  THAT'S ON THE AUDIO.

2  THEN HE SAID I PULLED UP IN MY CAR, GOT OUT WITH DRUGS.

3  THEN WHEN HE WAS LEAVING, HE SAID I WENT IN THE HOUSE.

4  HE'S CHANGING THE STORY TWICE.

5        **THE COURT:**  THE VIDEO WILL BE UP TO THE JURY TO

6  DECIDE WHO WENT IN THE HOUSE.  WHETHER IT WAS CRACK OR

7  POWDER, THOSE TYPE ISSUES ARE THE FACTS FOR THE JURY TO

8  FIND.  YOU MAY BE SEATED.  BRING THE JURY IN.

9      (JURORS ENTER INTO THE COURTROOM.)

10        **THE COURT:**  ALL RIGHT, MR. WALEN.  ON BEHALF OF

11  THE DEFENDANT, DO YOU HAVE ANY QUESTIONS FOR THIS WITNESS?

12        **MR. WALEN:**  YES, YOUR HONOR.

13        **THE COURT:**  YOU MAY PROCEED.

14                 **CROSS-EXAMINATION**

15  **BY MR. WALEN:**

16  **Q.**  GOOD AFTERNOON, MR. BATTS.

17  **A.**  GOOD AFTERNOON, SIR.

18  **Q.**  HOW ARE YOU DOING?

19  **A.**  PRETTY GOOD.

20  **Q.**  YOU SAID YOU WERE IN THE MILITARY FROM 2001 TO 2007,

21  IN THE ARMY; IS THAT CORRECT?

22  **A.**  YES, SIR.

23  **Q.**  THAT WAS SIX YEARS?

24  **A.**  FIVE AND A HALF.

25  **Q.**  AND YOU SERVED AS AN ARMORY UNIT?

**A.**   YES.

**Q.**   WHAT WAS YOUR MOS?

**A.**   19 KILO.  M1A1 TANKER.

**Q.**   WHAT WAS YOUR JOB IN THE TANK?

**A.**   LOADER, GUNNER, LOADER/GUNNER, DRIVER.

**Q.**   WHAT WAS YOUR RANK WHEN YOU GOT OUT?

**A.**   E-3.

**Q.**   PFC?

**A.**   YES, SIR.

**Q.**   AND YOU GOT OUT GENERAL UNDER HONORABLE CONDITIONS OR UNHONORABLE?

**A.**   NO, SIR, GOT OUT UNDER HONORABLE DISCHARGE.

**Q.**   WAS YOUR TIME UP?

**A.**   YES, SIR, MY TIME WAS UP.

**Q.**   OKAY.  IN THE CASE YOU HAVE PENDING IN FEDERAL COURT -- IT IS IN FEDERAL COURT, RIGHT?

**A.**   YES, SIR.

**Q.**   SO YOU HAVE BEEN CHARGED WITH CONSPIRACY TO DISTRIBUTE 50 GRAMS OR MORE OF -- WELL, YOU PLED TO DISTRIBUTING -- CONSPIRACY TO DISTRIBUTE 50 GRAMS OR MORE OF COCAINE, CORRECT, OR CRACK?

**A.**   CRACK COCAINE, THAT'S CORRECT, SIR.

**Q.**   AND AS PART OF THAT PLEA, YOU'VE AGREED TO COOPERATE, CORRECT?

**A.**   YES, SIR.

**Q.**   AND YOU KNOW THAT -- YOU TALKED THIS OVER WITH YOUR

ATTORNEY AND YOU LOOKED IT UP AND TALKED WITH OTHER PEOPLE

AND YOU KNOW THAT PART OF THE AGREEMENT IS THAT THE MORE

YOU DO THE BETTER, THE MORE CREDIT YOU GET, RIGHT?

**A.**   SIR, WHATEVER I TALKED WITH MY ATTORNEY ABOUT IS

BETWEEN HIM AND I, SIR.

**Q.**   WELL THEN YOU KNOW -- YOU ARE CORRECT.  YOU DO KNOW,

THOUGH, THAT THE MORE YOU HELP THE GOVERNMENT THE MORE

CREDIT YOU GET FOR THE TIME ON YOUR SENTENCE; ISN'T THAT

CORRECT?

**A.**   SIR, NOTHING WAS PROMISED TO ME.  I'M JUST HERE TO

TELL THE TRUTH.

**Q.**   SO YOU ARE JUST HERE BECAUSE IT'S YOUR CIVIC DUTY?

**A.**   I'M JUST HERE TO TELL THE TRUTH.

**Q.**   YOU ARE NOT EXPECTING TO GET ANYTHING OUT OF IT FROM

THE GOVERNMENT?

**A.**   I HOPE SO.

**Q.**   AND YOU ARE FAMILIAR WITH THE TERM 5K?

**A.**   I HEARD THE TERM.  I'M FAMILIAR WITH IT, SIR.

**Q.**   WHAT IS THAT?

**A.**   IT'S A TYPE OF REDUCTION.

**Q.**   AND THAT'S WHAT YOU GET WHEN YOU COOPERATE, RIGHT?

**A.**   NOTHING WAS PROMISED TO ME, SIR.

**Q.**   AND YOU KNOW YOU GET A THREE-LEVEL REDUCTION FOR

PLEADING GUILTY, RIGHT?

1   **A.**   I DO UNDERSTAND THAT.

2   **Q.**   IS THIS YOUR FIRST TIME CHARGED WITH A FEDERAL

3   OFFENSE?

4   **A.**   YES, SIR.

5   **Q.**   WHEN WERE YOU CHARGED?  WAS THIS AFTER OR BEFORE YOU

6   DID THE DRUG DEAL?

7   **A.**   I WAS CHARGED BEFORE.

8   **Q.**   SO AT THE TIME YOU DID THE DRUG DEALS WITH MR. PARKER

9   YOU WERE ALREADY CHARGED BY THE FEDERAL GOVERNMENT?

10  **A.**   YES, SIR.

11  **Q.**   HAD YOU BEEN INDICTED -- AFTER YOU GOT A TARGET

12  LETTER, DIDN'T YOU?

13  **A.**   YES, I GOT A FORMAL TARGET LETTER.

14  **Q.**   CAN YOU EXPLAIN TO THE JURY WHAT A TARGET LETTER IS,

15  IF YOU KNOW?

16  **A.**   A TARGET LETTER LET'S YOU KNOW THAT YOU HAVE BEEN

17  TARGETED, IDENTIFIED, SOME TYPE OF ILLEGAL ACTIVITY OR YOU

18  HAVE BEEN TARGETED BY THE FEDERAL GOVERNMENT FOR -- I

19  DON'T REMEMBER EXACTLY WHAT THE TARGET LETTER SAID BUT IT

20  LET'S YOU KNOW THAT THEY HAVE IDENTIFIED YOU.

21  **Q.**   BUT THEY HAVEN'T CHARGED YOU YET, THEY ARE JUST

22  TELLING YOU, YOU NEED TO COOPERATE OR YOU NEED TO COME IN

23  AND TALK TO THEM BEFORE THEY CHARGE YOU; IS THAT CORRECT?

24  THEY HAVEN'T CHARGED YOU, THEY ARE JUST TELLING YOU THEY

25  ARE THINKING ABOUT CHARGING YOU, RIGHT?

1   **A.**   CORRECT.

2   **Q.**   THEN YOU WENT AND TALKED TO THEM AND CAME TO AN

3   AGREEMENT THAT YOU WOULD HELP THEM OUT; IS THAT CORRECT?

4   **A.**   I TALKED WITH MY LAWYER.  I THINK I TALKED WITH MY

5   LAWYER.  I HAD TO REPORT TO DO LIKE AN ASSESSMENT.  I HAD

6   STEPS TO FOLLOW PENDING THAT TARGET LETTER.

7   **Q.**   WELL, HAD YOU BEEN WORKING AS AN INFORMANT FOR THE

8   POLICE PRIOR TO GETTING THE TARGET LETTER?

9   **A.**   NO, SIR.

10  **Q.**   SO YOUR INVOLVEMENT AS A CONFIDENTIAL INFORMANT, AS

11  THEY CALL THEM, CAME ABOUT BECAUSE OF THE TARGET LETTER

12  FROM THE FEDERAL GOVERNMENT?

13  **A.**   IT WOULD BE BECAUSE OF THE CHARGES THAT I ENDURED

14  FROM THE FEDERAL GOVERNMENT.

15  **Q.**   SO BEFORE YOU STARTED DEALING WITH MR. PARKER, OR

16  ALLEGEDLY DEALING WITH MR. PARKER, YOU HAD BEEN DEALING

17  DRUGS YOURSELF?

18  **A.**   YES, SIR.

19  **Q.**   WELL, YOU PLED TO IT, SO OBVIOUSLY YOU HAD.

20  **A.**   YES, SIR.

21  **Q.**   OKAY.  AND HOW LONG HAD YOU BEEN DEALING DRUGS?

22  **A.**   IT WAS A ONE-TIME THING.  I WASN'T NOWHERE KNOWN.  IT

23  WAS A ONE-TIME THING.  I DID SOMETHING FOR SOMEBODY AND I

24  WAS GUILTY OF IT.

25  **Q.**   SO ONE TIME YOU DEALT 50 GRAMS OF COKE AND GOT

1   CRACK —— OR CRACK AND GOT BUSTED?

2   **A.**   PRETTY MUCH, SIR.

3   **Q.**   NEVER BEFORE THAT IN YOUR LIFE YOU NEVER DID DRUGS?

4   **A.**   NO, SIR.

5   **Q.**   YOU WEREN'T DEALING WHILE IN THE ARMY?

6   **A.**   NO, SIR.

7   **Q.**   YOU WEREN'T USING THEM?

8   **A.**   NO, SIR.

9   **Q.**   NEVER USED THEM BEFORE IN YOUR LIFE, I GUESS?

10  **A.**   I USED MARIJUANA BEFORE, SIR.

11  **Q.**   HAD A COUPLE OF BEERS?

12  **A.**   YES, SIR.

13  **Q.**   OKAY.  YOU GOT PAID FOR DOING THIS FOR THE

14  GOVERNMENT —— FOR THE STATE?

15  **A.**   YES.

16  **Q.**   THE WILMINGTON POLICE DEPARTMENT OR WHOEVER YOU

17  WORKED FOR, THEY PAID YOU, RIGHT?

18  **A.**   YES, SIR.

19  **Q.**   AND OTHER THAN THE 200 AND THE HUNDRED YOU KEPT, HOW

20  MANY TIMES DID YOU GET PAID BEFORE THAT?  HOW LONG DID YOU

21  DO THIS?

22  **A.**   I WAS AN INFORMANT FROM APRIL —— EXCUSE ME, JULY '09

23  TO MAY 17.

24  **Q.**   WAS THIS YOUR FULL-TIME JOB OR DID YOU HAVE ANOTHER

25  JOB?

**A.**   I HAD ANOTHER JOB.

**Q.**   WHAT WAS THAT?

**A.**   LONGSHOREMAN.

**Q.**   WHERE AT?

**A.**   LONGSHOREMAN.

**Q.**   I HEARD YOU.

**A.**   WILMINGTON, NORTH CAROLINA, INTERNATIONAL

LONGSHOREMAN ASSOCIATION.

**Q.**   WHAT DID YOU DO THERE?

**A.**   TIE UP IMPORT/EXPORT CARGO.

**Q.**   WHEN YOU SAY THAT YOU MEAN YOU WORKED AT THE

SHIPYARD, RIGHT?

**A.**   THAT'S CORRECT.

**Q.**   OR THE DOCKS, OKAY.

     SO HOW MANY PEOPLE WOULD YOU SAY YOU WORKED WITH WITH

THE WILMINGTON POLICE DEPARTMENT OR THE TASK FORCE SETTING

UP BEFORE YOU GOT AROUND TO SETTING UP MR. PARKER?

**A.**   A FEW.

**Q.**   TEN, 20?

**A.**   NO, SIR.  I COULDN'T GIVE YOU A FIGURE BUT IT WAS

OVER TEN, POSSIBLY OVER TEN.

**Q.**   DID YOU GET PAID FOR ALL OF THEM?

**A.**   NO, SIR.

**Q.**   HAVE YOU TESTIFIED IN ANY OTHER TRIALS FOR PEOPLE YOU

ROLLED ON OR TURNED ON OR SET UP?

1   **A.**   YES, SIR.

2   **Q.**   HOW MANY TRIALS?

3   **A.**   ONCE.

4   **Q.**   SO THIS IS YOUR SECOND TESTIMONY?

5   **A.**   YES, SIR.

6   **Q.**   YOU GOT ANYMORE SCHEDULED?

7          **MR. SEVERO:**  OBJECTION, YOUR HONOR.

8          **THE COURT:**  OVERRULED.

9   **A.**   NEGATIVE KNOWLEDGE.

10  **Q.**   YOU TALK LIKE YOU ARE IN THE ARMY.  NEGATIVE

11  KNOWLEDGE, THAT'S ARMY TALK.

12         **THE COURT:**  NEXT QUESTION.

13  **BY MR. WALEN:**

14  **Q.**   ALL RIGHT.  WHEN YOU GOT THESE ALLEGED DRUGS FROM MR.

15  PARKER, THE WHITE SUBSTANCE, YOU HAD NO -- YOU ARE NOT A

16  CHEMIST, I'M ASSUMING?

17  **A.**   NO, SIR.

18  **Q.**   YOU DIDN'T DO ANY TESTS ON THE DRUGS?

19  **A.**   NO, SIR.

20  **Q.**   SO YOU DON'T KNOW WHETHER THEY WERE CRACK OR POWDER?

21  **A.**   NO, SIR.

22  **Q.**   YOU NEVER TESTED THEM?

23  **A.**   NO, SIR.

24  **Q.**   FOR ALL YOU KNOW IT COULD HAVE BEEN BAKING POWDER?

25  **A.**   YOU ARE CORRECT.

1   **Q.**   AT THE TIME YOU WERE INVOLVED IN THESE TWO -- JUST

2   TWO, RIGHT, WITH MR. PARKER, ONE ON 11/9 AND ONE ON 12/1?

3   **A.**   YES, SIR.

4   **Q.**   DURING THE PENDENCY OF BOTH OF THOSE ACTIVITIES, DID

5   YOU EVER SEE ANY GUNS, FIREARMS WITH MR. PARKER?  DID HE

6   HAVE A GUN ON HIS HIP OR IN A SHOULDER HOLSTER OR

7   ANYTHING?

8   **A.**   I CAN'T REMEMBER, SIR.

9   **Q.**   DID YOU HAVE A GUN?

10  **A.**   NO, SIR.

11        **MR. WALEN:**  THANK YOU.  I HAVE NOTHING ELSE.

12        **THE COURT:**  REDIRECT, MR. SEVERO?

13        **MR. SEVERO:**  YES, YOUR HONOR.

14                   **REDIRECT EXAMINATION**

15  **BY MR. SEVERO:**

16  **Q.**   MR. WALEN REFERRED TO YOU TESTIFYING AT TRIALS?

17  **A.**   YES.

18  **Q.**   WAS THAT AS A WITNESS IN A RAPE CASE?

19  **A.**   YES, SIR.

20        **MR. SEVERO:**  NOTHING FURTHER, YOUR HONOR.

21        **THE COURT:**  REDIRECT, MR. WALEN?

22        **MR. WALEN:**  NO, SIR.

23        **THE COURT:**  ALL RIGHT.  THIS CONCLUDES YOUR

24  TESTIMONY, MR. BATTS.  YOU MAY BE EXCUSED.  THANK YOU.

25                   END OF TRANSCRIPT

CERTIFICATE

1

THIS IS TO CERTIFY THAT THE FOREGOING TRANSCRIPT OF

2 PROCEEDINGS TAKEN AT THE CRIMINAL SESSION OF UNITED STATES

3 DISTRICT COURT IS A TRUE AND ACCURATE TRANSCRIPTION OF THE

4 PROCEEDINGS TAKEN BY ME IN MACHINE SHORTHAND AND

5 TRANSCRIBED BY COMPUTER UNDER MY SUPERVISION.

6

THIS THE 5TH DAY OF MARCH, 2011.

7

8

/S/ DONNA J. TOMAWSKI

9

DONNA J. TOMAWSKI
OFFICIAL COURT REPORTER

10