UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION


UNITED STATES OF AMERICA,          )
                                   )
          V.                       )        7:10-CR-11-H
                                   )
RUSHAUN NECKO PARKER,              )
                                   )
          DEFENDANT.               )
_____    )


CLOSING ARGUMENTS
MARCH 2, 2011
BEFORE THE HONORABLE MALCOLM J. HOWARD
SENIOR U.S. DISTRICT JUDGE



APPEARANCES:

FOR THE GOVERNMENT:

MR. TIMOTHY SEVERO
SPEC. ASST. U.S. ATTORNEY
310 NEW BERN AVE.
RALEIGH, NC


FOR THE DEFENDANT:

MR. JAMES WALEN
ATTORNEY AT LAW
P.O. BOX 2125
MOREHEAD CITY, NC




COURT REPORTER:  DONNA J. TOMAWSKI
STENOTYPE WITH COMPUTER AIDED TRANSCRIPTION

MARCH 2, 2011

1

2       **THE COURT:**  MR. SEVERO, WE'RE READY TO HEAR YOU,

3  SIR.

4       **MR. SEVERO:**  THANK YOU, YOUR HONOR, MR. WALEN.

5       MEMBERS OF THE JURY, AS HIS HONOR JUST TOLD YOU, HE'S

6  ABOUT TO GIVE YOU THE LAW BUT WHAT I'M GOING TO DO IS GIVE

7  YOU A BRIEF HAND EXAMPLE OF IT BEFORE I START SPEAKING TO

8  YOU ABOUT THE EVIDENCE.  AS HIS HONOR INSTRUCTED YOU AT

9  THE BEGINNING OF THIS AND AS HE WILL INSTRUCT YOU AT THE

10  END, YOU ARE THE SOLE ARBITERS OF THE FACTS OF THIS CASE,

11  AND YOU ARE TO DISCUSS THEM.

12       AS YOU WILL HEAR FROM HIS HONOR IN JUST A MOMENT, ONE

13  OF THE THINGS IS A CONSPIRACY.  A CONSPIRACY IS SIMPLY AN

14  AGREEMENT BETWEEN TWO OR MORE PEOPLE TO EITHER DO A LAWFUL

15  ACT ILLEGALLY OR AN ILLEGAL ACT DONE BY ITSELF.  A

16  CONSPIRACY ITSELF, IT DOESN'T HAVE TO BE IN WRITING,

17  EVERYBODY IN THE CONSPIRACY DOESN'T EVEN HAVE TO BE

18  INVOLVED IN ALL OF THE PORTIONS OF THE CONSPIRACY.  THERE

19  DOESN'T HAVE TO BE ANY SORT OF FORMAL AGREEMENT, IT

20  DOESN'T HAVE TO BE WRITTEN DOWN ANYWHERE, DOESN'T EVEN

21  HAVE TO BE SPOKEN.  IT CAN BE A LOOK OR GLANCE OR EVEN

22  KIND OF AN UNDERSTANDING OF THINGS.

23       AGAIN, A CONSPIRACY DEALS WITH THE AGREEMENT ITSELF.

24  CERTAINLY YOU CAN TAKE THE ACTIONS THAT SOMEONE DOES OR A

25  GROUP OF PEOPLE DO TO SHOW THE AGREEMENT THAT THEY DID IN

1    FACT HAVE.  YOU CAN SEE AGAIN ALL OF THE MEMBERS DON'T

2    HAVE TO SHARE EACH AND EVERY PORTION OF WHAT THEY ARE

3    DOING.

4        THE SUBSTANTIVE COUNTS THAT YOU ARE GOING TO HEAR,

5    FIRST YOU WILL HEAR ABOUT A CONSPIRACY COUNT.  THE

6    SUBSTANTIVE COUNTS YOU WILL FIRST HEAR ABOUT IS

7    DISTRIBUTION, AND THAT IS SIMPLY THE EXCHANGE OR THE

8    GIVING OF AN ITEM.  IN THIS CASE, AS YOU HEARD FROM THE

9    EVIDENCE, THERE ARE TWO TIMES WHEN THERE WAS ACTUAL

10   DISTRIBUTION.

11       THE NEXT ELEMENT WILL BE ABOUT THE WEIGHT AND TYPE OF

12   SUBSTANCE.  YOU'VE HEARD, AND I'M GOING TO GO OVER AGAIN

13   ABOUT THE WEIGHT BASED UPON EACH OF THE DISTRIBUTIONS AND

14   WHAT THE SUBSTANCE WAS, COCAINE BASE, OR WHAT'S COMMONLY

15   REFERRED TO AS CRACK, AND THE DEFENDANT KNEW HE WAS GIVING

16   SOME SUBSTANCE TO SOMEONE ELSE.

17       COUNT THREE IS THE SAME EXCEPT DIFFERENTIATED BY THE

18   WEIGHT.

19       COUNT FOUR, AND THE ORDER GIVEN BY THE JUDGE MAY BE

20   DIFFERENT THAN THE ORDER I'M GIVING YOU, BUT IT'S SORT OF

21   THE SAME IDEA.  THE DIFFERENCE HERE, AGAIN BESIDES KNOWING

22   THAT IT'S A CONTROLLED SUBSTANCE, IS THE INTENT TO

23   DISTRIBUTE IT.  THE JUDGE IS GOING TO TELL YOU THAT INTENT

24   IS SELDOMLY PROVED BY DIRECT EVIDENCE, IT'S A MENTAL

25   STATE.  YOU CAN LOOK AT THE FACTS AND CIRCUMSTANCES,

1  THINGS LIKE THE WEIGHT, WHERE IT'S LOCATED, OTHER ACTS OF

2  DISTRIBUTION, THINGS THAT PEOPLE SAID, HOW IT WAS

3  PACKAGED, THOSE TYPE OF THINGS TO INFER INTENT.

4       THE LAW, AS YOU WILL HEAR, RECOGNIZES TWO TYPES OF

5  POSSESSION.  THERE'S ACTUAL POSITION, AND THAT COULD BE

6  SOMETHING LIKE THIS THAT I'M HOLDING IN MY HAND.  THAT'S

7  ACTUAL POSSESSION.  AND THE JUDGE WILL INSTRUCT YOU ABOUT

8  CONSTRUCTIVE POSSESSION.  THAT IS SOMETHING YOU EXERT

9  DOMINION OR CONTROL OVER.  FOR INSTANCE, THE WATER JUG

10  THAT'S HERE, I CAN PICK IT UP OR NOT PICK IT UP.  THE FACT

11  I CAN EXERCISE DOMINION OR CONTROL IS AN EXAMPLE OF

12  CONSTRUCTIVE POSSESSION.  THAT'S GOING TO BE MENTIONED AS

13  IT RELATES TO THE POSSESSION OF INTENT TO DELIVER CHARGE

14  AND THE FIREARM CHARGE.

15       AGAIN, POSSESSION IS DIFFERENT THAN OWNERSHIP.  YOU

16  CAN HAVE MULTIPLE PEOPLE WHO CAN BE IN POSSESSION OF AN

17  ITEM.

18       THE NEXT COUNT YOU WILL HEAR IS POSSESSION OF A

19  FIREARM BY A PROHIBITED PERSON OR A CONVICTED FELON IN

20  THIS CASE.  AGAIN, I WILL GO OVER THE EVIDENCE WITH YOU IN

21  A MOMENT.

22       AS YOU CAN SEE FROM THE ELEMENTS, BASICALLY THAT ON

23  OR ABOUT JANUARY 27, 2010, THE DEFENDANT POSSESSED THAT

24  FIREARM.  HE WAS CONVICTED OF AN OFFENSE THAT WAS

25  PUNISHABLE BY A TERM THAT CAN CARRY MORE THAN A YEAR, AND

1   I WILL TELL YOU THAT ALL FELONIES IN NORTH CAROLINA CARRY

2   A POTENTIAL PUNISHMENT OF MORE THAN A YEAR.  SO ALL

3   FELONIES IN NORTH CAROLINA, IF YOU ARE CONVICTED OF ANY

4   FELONY, CARRIES THAT TYPE OF PUNISHMENT.

5       AND THEN FINALLY THAT THE FIREARM AFFECTED INTERSTATE

6   COMMERCE.  THAT IS SORT OF A LAWYERLY WAY OF SAYING THAT

7   IT WAS MANUFACTURED IN CHINA OR MANUFACTURED SOMEWHERE

8   OUTSIDE OF THE STATE OF NORTH CAROLINA, THEREFORE IT HAD

9   TO TRAVEL INTO NORTH CAROLINA.  IN FACT, IN THIS CASE IT

10  WAS CHINA.

11      COUNT SIX IS POSSESSION OF A FIREARM IN FURTHERANCE

12  OF A DRUG TRAFFICKING OFFENSE.  HIS HONOR WILL INSTRUCT

13  YOU THAT YOU FIRST HAVE TO FIND A DRUG TRAFFICKING

14  OFFENSE.  A DRUG TRAFFICKING OFFENSE CAN BE CONSPIRACY TO

15  POSSESS WITH THE INTENT TO DISTRIBUTE MORE THAN 50 GRAMS

16  OR ANY AMOUNT OF COCAINE.  AND THE SECOND PART OF THAT IS

17  HAVING THAT IN FURTHERANCE OF A DRUG TRAFFICKING OFFENSE.

18      IN FURTHERANCE IS AN IDEA THAT IF SOMEONE USES OR HAS

19  THAT FIREARM SO IT EMBOLDENS THEM IF THEY HAVE IT FOR

20  PROTECTION, WHETHER IT'S TO PROTECT THEIR ASSETS, PROTECT

21  THEIR PLACE WHERE THEY'RE KEEPING THEIR DRUGS, OR WHETHER

22  IT MAKES THEM FEEL COMFORTABLE TO KEEP SELLING THE DRUGS.

23  THOSE ARE SOME EXAMPLES OF WHAT HAVING A FIREARM IN

24  FURTHERANCE OF A DRUG TRAFFICKING OFFENSE IS.

25      FINALLY, CONSPIRACY TO COMMIT MONEY LAUNDERING.  HIS

1    HONOR WILL GIVE YOU THE INSTRUCTIONS, BUT TO REDUCE IT

2    DOWN, YOU HAVE THE IDEA OF CONSPIRACY, WHICH IS AN

3    AGREEMENT.  AND THEN IT'S A NOTION OF SOME SORT OF

4    FINANCIAL TRANSACTION, WHETHER IT BE PURCHASING A CAR,

5    HAVING IT CONCEALED IN SOME FORM OR FASHION, LIKE HAVING

6    SOMEONE ELSE'S NAME PLACED IN YOUR CAR OR A CAR IN YOUR

7    NAME, OR SOMETHING LIKE TAKING THE PROCEEDS AND PAYING THE

8    RENT FOR A RESIDENCE, ESPECIALLY A RESIDENCE IN WHICH THE

9    NARCOTICS WERE STORED IN, THINGS OF THAT NATURE OF TAKING

10   THE FINANCIAL PROCEEDS FROM AN ILLEGAL ACTIVITY, IN THIS

11   CASE DRUG DISTRIBUTION, AND USING THOSE TO FURTHER THE

12   ACTIVITY.

13        NOW, I'M GOING TO GO THROUGH THE EVIDENCE JUST

14   BRIEFLY.  IT'S NOT BEEN AN EXTREMELY LONG TRIAL, AT LEAST

15   NOT IN NUMBER OF DAYS, SO I WILL JUST TOUCH ON SOME OF THE

16   HIGHLIGHTS.  I WILL START WITH THE CONSPIRACY CHARGE.

17        STARTING WITH MR. RIVERS, WHO GOT ON THE STAND AND HE

18   TESTIFIED, AND CERTAINLY HE TESTIFIED THAT HE PICKED THE

19   DEFENDANT OUT OF A PHOTOGRAPH AND THEN HE MENTIONED THAT

20   HE HAD SEEN HIM WITH SOMEBODY OR IN ASSOCIATION WITH

21   SOMEBODY WHO HE KNEW, AND IT HAPPENED TO BE AGAIN SOMEBODY

22   WHO WAS IN THE PHOTOGRAPH THAT WAS RIGHT THERE WITH THE

23   DEFENDANT SEIZED OUT OF HIS HOME.  AGAIN, THE SAME

24   PHOTOGRAPH THAT MS. LEWIS IDENTIFIED AS BEING THE PERSON

25   THAT WAS WITH THE DEFENDANT WHEN SHE WENT THERE TO SIGN

1   OVER OR PUT THE CAR IN HER NAME THAT THE DEFENDANT WAS

2   PAYING FOR.

3      YOU HEARD MR. RIVERS TESTIFY ABOUT THE TIMES IN JULY

4   WHERE HE WENT TO HENRY STREET AND HE PURCHASED AN OUNCE

5   AND THEN HE PURCHASED THE DEUCE, AND ALL OF THOSE BEING

6   COCAINE.  JUST AS IMPORTANTLY, YOU HEARD FROM THE

7   DEFENDANT'S OWN WORDS, HIS STATEMENT ABOUT BEING INVOLVED

8   IN A CONSPIRACY, ABOUT HOW HE OBTAINED COCAINE, JUST

9   STARTING FROM THE LAST YEAR WHEN HE WAS TAKING THAT DEUCE,

10   OR THOSE 62 GRAMS OF COCAINE BASE, AND SELLING THOSE TWICE

11   A MONTH IN THAT SAME AREA.

12      AGAIN, HE TALKED ABOUT HOW HE WAS RECEIVING THAT

13   COCAINE FROM OUT OF TOWN, FROM TEXAS, AND HAVING RECEIVED

14   IT FROM A HISPANIC MALE AND THEN CONVERTING THE COCAINE

15   INTO COCAINE BASE AND SELLING IT, AND SELLING IT FOR A

16   LONG PERIOD OF TIME.

17      THEN I'LL MOVE ONTO THE DISTRIBUTION CHARGE ON

18   NOVEMBER 9.  YOU WILL BE GIVEN INSTRUCTIONS ABOUT A

19   CONFIDENTIAL INFORMANT.  IT'S OBVIOUS THAT A CONFIDENTIAL

20   INFORMANT IS SOMEONE WHO AGREES TO DO THAT.  THEY DON'T --

21   THEY DON'T DO IT, IN THIS CASE, HAVE A CIVIC

22   RESPONSIBILITY, BUT, BY THE SAME TOKEN, YOU CAN LOOK AT OR

23   FOCUS ON WHAT LAW ENFORCEMENT DID WHEN THEY STARTED THAT

24   OPERATION.  THEY STRIP SEARCHED MR. BATTS.  THEY GAVE MR.

25   BATTS RECORDING DEVICES AND THEY PROVIDED SURVEILLANCE ON

1  MR. BATTS GOING TO AND FROM.  AND YOU HEARD THOSE

2  RECORDINGS AND YOU REMEMBER THAT MONEY BEING COUNTED OUT.

3      THERE WAS NO EVIDENCE WHATSOEVER CONTRARY TO WHAT MR.

4  BATTS SAID ABOUT THE FACT THAT HE GAVE HIM $1,800 FOR THE

5  COCAINE, FOR THE 60 GRAMS, THAT DEUCE THAT WAS SUBMITTED

6  TO THE STATE BUREAU OF INVESTIGATION, THE 60 GRAMS OF

7  COCAINE BASE.  AND YOU CAN HEAR ALL OF THAT MONEY BEING

8  COUNTED.  HE WAS STRIP SEARCHED BEFORE, HE WAS STRIP

9  SEARCHED AFTER, HE WAS FOLLOWED THERE, HE'S FOLLOWED BACK.

10      AGAIN, THEN FOCUSING ON, AND YOU HEARD THAT RECORDED

11  PHONE CALL.  AGAIN, THERE'S BEEN NO EVIDENCE TO THE

12  CONTRARY, THE RECORDED PHONE CALL FROM MR. BATTS TO THE

13  DEFENDANT WHO IDENTIFIED HIMSELF ON THOSE PHONE CALLS AS

14  DUKE.  YOU SEEN THE TATTOO.  HE HAS DUKE TATTOOED BIG AS

15  LIFE ON HIS BACK, LETTERS IN HIS HOUSE ADDRESSED TO DUKE.

16  EVEN MS. LEWIS KNEW HIM AS DUKE.  YOU HEARD THAT.

17      AND THEN THE SECOND PHONE CALL.  AGAIN, YOU HEARD

18  THAT PHONE CALL.  THAT WAS A PHONE CALL DISCUSSING

19  NARCOTICS.  ON THAT OCCASION WHEN HE DISCUSSES AN ONION OR

20  AN OUNCE, THERE'S AN INITIAL CONVERSATION ABOUT POWDER

21  COCAINE.  YOU SAW THE VIDEOTAPE THAT YOU CLEARLY SEE THIS

22  DEFENDANT GET INTO THE CAR.  YOU HEAR MONEY BEING COUNTED

23  OUT.  AND THEN MR. BATTS TOLD YOU ABOUT THE EXCHANGE.  AS

24  THE STATE BUREAU OF INVESTIGATION SAID, THAT 27 GRAMS OF

25  COCAINE BASE WHICH WAS EXCHANGED FOR $900, AND ALL OF THAT

1  WAS ABSOLUTELY CONSISTENT WITH THE PHONE CALL, WITH THE

2  THINGS THAT WERE HEARD ON ALL OF THE RECORDING DEVICES.

3      THEN TURNING OR GOING TO FEBRUARY 27, THE EXECUTION

4  OF THE SEARCH WARRANT.  YOU HEARD THE SWAT OFFICER SAY

5  WHEN HE CAME IN OR BREACHED THAT WINDOW, WHERE WAS THE

6  DEFENDANT?  HE WAS IN HIS BED WITHIN ARM'S REACH OF A

7  FIREARM.  ADDITIONALLY, THE BED WAS SEVERAL FEET OR RIGHT

8  ACROSS THE HALLWAY FROM THE BATHROOM, AND IN THE VENT WAS

9  72 GRAMS OF COCAINE BASE.  YOU HEARD ALL OF THOSE OFFICERS

10  TELL YOU, EVEN MS. RIVERS (SIC) TOLD YOU HOW MUCH THAT WAS

11  AND HOW MANY DIFFERENT PEOPLE THAT COULD BE SOLD TO.  AND

12  WHEN MR. RIVERS WAS BUYING THOSE DEUCES, HE WAS BUYING

13  THOSE DEUCES TO SELL TO PEOPLE ON THE STREET AND TO SELL

14  TO A NUMBER OF PEOPLE ON THE STREET.  AND THEN AFTER HE

15  SOLD THE FIRST BATCH, HE WENT BACK TO THE DEFENDANT, GOT

16  ANOTHER BATCH TO SELL TO THE PEOPLE IN THE STREET.  AND

17  THEN AGAIN, WHERE IT IS PACKAGED AND THE LOCATION THAT IT

18  WAS FOUND, RIGHT ACROSS FROM THIS DEFENDANT.

19      YOU REMEMBER THE VIDEO WITH ALL THE MONEY IN IT.  IN

20  THE SAME BATHROOM, THROWING ALL OF THAT MONEY IN THE SINK.

21  THINK ABOUT ALL OF THE LIVES THAT ARE BEING DESTROYED WITH

22  ALL OF THAT MONEY BEING THROWN IN THE SINK AND ALL OF THE

23  MONEY LAYING ON THE FLOOR.  YOU EVEN SAW IN THE VIDEO

24  THERE'S MONEY LYING RIGHT NEXT TO THE VENT WHERE HE LATER

25  ON HAS THOSE 72 GRAMS OF CRACK COCAINE.

1    NOW, GOING BACK TO THE FIREARM.  AS I SAID BEFORE AND

2    I THINK THE EVIDENCE WAS CERTAINLY CLEAR, THAT AGENT

3    GLASSCOCK TESTIFIED THAT THAT RIFLE WAS, I THINK IT WAS A

4    HANDGUN, WAS MANUFACTURED IN CHINA AND THAT IT WAS

5    DESIGNED AND FULLY CAPABLE OF KILLING SOMEONE.

6    YOU HEARD FROM THE DEFENDANT'S OWN WORDS WHY HE HAD A

7    FIREARM, FOR PROTECTION.  HE HAD IT FOR PROTECTION BECAUSE

8    HE WAS A DRUG DEALER AND IT'S DANGEROUS, ESPECIALLY WHEN

9    YOU ARE POSTING THE AMOUNT OF MONEY THAT YOU HAVE ON THE

10   INTERNET LIKE THAT, THERE'S A DANGER THAT YOU ARE GOING TO

11   BE ROBBED.  WHEN YOU KEEP 72 GRAMS OF COCAINE BASE IN YOUR

12   VENT RIGHT ACROSS THE HALLWAY FROM YOU, THERE'S A DANGER

13   THAT YOUR HOUSE IS GOING TO BE BROKEN INTO, THAT EITHER

14   YOUR MONEY WILL BE STOLEN OR THAT YOUR DRUGS ARE GOING TO

15   BE STOLEN, AND THAT'S WHY YOU HAVE A FIREARM.

16   GRANTED, IT WAS PACKAGED, OR IT WAS STILL PACKAGED.

17   NOW HE TOLD YOU HE HAD GOTTEN IT AT 4 P.M. THE DAY BEFORE.

18   I GUESS HE HADN'T TAKEN IT OUT OF THE PACKAGE.  WHEN MR.

19   WALEN ASKED THE AGENT TO CONVERT IT, HOW LONG DID IT TAKE?

20   WHAT, 15, 20 SECONDS TO TAKE THAT FIREARM FROM THE WAY IT

21   WAS PACKAGED TO BE IN A POSITION TO KILL SOMEONE.  SO I

22   WOULD CONTEND TO YOU CERTAINLY THAT THAT FIREARM, WHERE IT

23   WAS PLACED AND HOW IT WAS PLACED AND THE PROXIMITY IT WAS

24   TO THE DRUGS AND THE STATEMENTS THAT HE MADE ABOUT HAVING

25   IT FOR PROTECTION, IT WAS THERE TO FURTHER HIS DRUG

1    TRAFFICKING BUSINESS.

2         NOW, AS IT RELATES TO HIS ABILITY TO POSSESS THAT

3    FIREARM, OR BEING A CONVICTED FELON, YOU HEARD FROM THE

4    OFFICER -- YOU HEARD FROM THE DETECTIVE WHO CAME IN AND

5    SAID, NOT ONLY DID WE ARREST HIM FOR A DRUG OFFENSE BUT

6    THEY ARRESTED HIM IN THE EXACT SAME BEDROOM IN 2006 THAT

7    HE WAS FOUND ON THE DAY THAT THEY EXECUTED THE SEARCH

8    WARRANT.  ON THAT DAY THERE WAS A SAFE.  IT HAD, I THINK

9    ABOUT $1,700 IN IT.  AGAIN, THAT'S ENTIRELY CONSISTENT

10   WITH THE STATEMENT THAT HE GAVE TO LAW ENFORCEMENT ABOUT

11   WHAT HE HAD BEEN DOING AND HOW LONG HE HAD BEEN DOING IT

12   AND THE FACT THAT HE HAD 200 OTHER DOLLARS LYING AROUND

13   AND THAT THERE WAS A SET OF DIGITAL SCALES IN THERE AT

14   THAT TIME THAT HAD A SMALL AMOUNT OF COCAINE BASE ON IT.

15   WHEN THE OFFICERS TOOK HIM DOWN, THEY HAD AN ADDITIONAL

16   SMALL AMOUNT OF COCAINE BASE.

17        AGAIN, THAT'S CONSISTENT AGAIN WITH THE STATEMENT

18   THAT HE GIVES TO LAW ENFORCEMENT.  AND EVEN HIS TATTOO,

19   HE'S MOVING UP FROM PIECES, WHICH IS WHAT THEY FOUND HIM

20   WITH IN 2006, TO WEIGHT, WHICH IS WHAT HE WAS FOUND WITH

21   ON JANUARY 27, 2010.

22        ADDITIONALLY, YOU HEARD THE PROSECUTOR COME IN AND

23   IDENTIFY MR. PARKER AS THE PERSON HE TOOK THE PLEA ON FOR

24   THAT EXACT SAME CASE.  THE DATE OF BIRTH MATCHES UP, THE

25   NAME MATCHES UP, THE NUMBERS MATCH UP.  THE OFFICER

1  IDENTIFIED HIM THAT ARRESTED HIM, THE PROSECUTOR CAME IN

2  AND SAID THAT'S THE GENTLEMAN I CONVICTED ON THAT DAY.

3  YOU HAVE SEEN THE JUDGMENT.  YOU HAVE THE JUDGMENT HERE.

4  ADDITIONALLY, THEN THE CLERK CAME IN TO INTRODUCE THE

5  JUDGMENT.

6      AS I SAID, AND I'LL GO THROUGH ON THE MONEY

7  LAUNDERING CHARGE, START WITH -- I'LL START IN REVERSE

8  ORDER.  YOU HEARD AGENT TAYLOR TELL YOU ABOUT WHY PEOPLE

9  HIDE ASSETS, WHY THEY HIDE THINGS, WHAT'S THE REASON FOR

10  CONCEALING SOMETHING LIKE THAT.  AND THAT'S WHAT THIS

11  DEFENDANT DID.  HE CALLED UP AN ACQUAINTANCE AND HAD THAT

12  PERSON COME DOWN AND KNOWINGLY, WITHOUT PAYING A PENNY FOR

13  THE CAR, WITHOUT BUYING THE CAR, KNOWINGLY PUT THAT CAR IN

14  THEIR NAME FOR MR. PARKER.  NO REASON TO DO THAT BUT TO

15  HIDE OR CONCEAL WHOSE AUTOMOBILE THAT WAS.  MS. LEWIS

16  NEVER TESTIFIED AND IT WAS NEVER CONTRADICTED THAT EXCEPT

17  FOR THE DAY THAT SHE DROVE THAT CAR OFF THE LOT, FROM MUNN

18  MOTOR SPORTS, SHE HAD NEVER BEEN IN IT, NEVER BEEN IN IT

19  SINCE.  SHE, WITH MR. PARKER, CONCEALED THE IDENTITY OF

20  THE TRUE OWNERSHIP OF THAT CAR AND THEN, WHEN SHE GOT THE

21  TITLE, WHAT DID SHE DO?  SHE CONTACTED A FAMILY MEMBER OF

22  THE DEFENDANT AND THEY TRANSFERRED THE TITLE, NOT INTO

23  THIS PERSON'S NAME, NOT INTO MR. PARKER'S NAME, THEY

24  TRANSFERRED IT INTO SOMEBODY ELSE'S NAME.

25      NOW, YOU HAVE HEARD EVIDENCE THAT MR. PARKER WAS IN

THAT CAR ON NOVEMBER 9, 2009.  HE WAS IN THAT CAR ON

DECEMBER 1, 2009.  HE WAS STOPPED ON TRAFFIC STOP

DECEMBER 4, 2009, DRIVING THAT CAR OR BEING IN THAT CAR ON

ALL OF THOSE OCCASIONS.  YOU HAVE SEEN HIM ON THE

VIDEOTAPE ON JANUARY 27, 2010.  THE ONLY PERSON, IF

THERE'S ANY EVIDENCE WHATSOEVER, OPERATING THIS AUTOMOBILE

IS THE DEFENDANT.  NOT ANY OF THOSE OTHER PEOPLE THAT HE

HAD THAT CAR IN HIS NAME.  OF COURSE, HE TOLD THE OFFICERS

THAT HE PAID FOR IT AND HE EVEN TOLD THEM THE PRICE HE

PAID, $8,500.  LO AND BEHOLD, THAT MATCHES EXACTLY WHAT

WAS PAID.  HE TOLD THEM WHERE IT WAS PURCHASED FROM, AND

HE SAT BY MS. LEWIS THE ENTIRE TIME WHILE SHE FILLED OUT

THOSE DOCUMENTS, NEVER INTENDING TO TAKE THAT AUTOMOBILE.

THAT'S CONSPIRACY IN MONEY LAUNDERING RIGHT THERE.

BUT THERE'S MORE, BECAUSE AS YOU HEARD AGAIN, FROM

MR. PARKER'S OWN STATEMENT, I KNOW YOU HAVE SEEN IT, NOT

ONLY DID HE GIVE A STATEMENT BUT, AS YOU HAVE SEEN, HE

INITIALED EVERY PAGE.  SO WHEN THEY ASKED HIM THE

QUESTIONS ABOUT THINGS AND WHAT HE DID, HE HAD A CHANCE TO

AMEND IT.  YOU HAVE SEEN THERE ARE PORTIONS WHERE HE ASKED

THEM TO AMEND THEM, BUT HE DIDN'T ASK THEM TO AMEND THESE

THINGS THAT SAID HOW HE GOT THE CAR, BECAUSE THAT'S THE

TRUTH.

HE ALSO, WHEN HE WAS ASKED ABOUT WHAT HE WAS DOING

WITH HIS PROCEEDS AND, AGAIN, THERE'S NOT ANY EVIDENCE

1 WHATSOEVER THAT MR. PARKER HAS EVER WORKED A DAY IN HIS

2 LIFE IN A REAL JOB, NONE. IN FACT, HE SAYS HE DOESN'T

3 HAVE ANY INCOME, NEVER FILED A TAX RETURN. THEN HE TOLD

4 THE OFFICERS, AND AGAIN, WHICH IS CONSISTENT, AND YOU HAVE

5 SEEN THAT AMOUNT OF CURRENCY, YOU HAVE SEEN THE THINGS IN

6 HIS CLOSET, THE ACCESS TO MONEY THAT WE KNOW HE HAD, THAT

7 HE TOOK SOME OF THE MONEY. WHAT DID HE SAY HE HAD DONE

8 WITH THE MONEY? HE INITIALLY SAID THAT HE HAD SPENT IT ON

9 CLOTHES, JEWELRY, CARS, CLUBS AND WOMEN.

10 IF YOU LOOK AT HIS CLOSET, THAT PICTURE OF HIS

11 CLOSET, THERE ARE CLOTHES EVERYWHERE, THERE ARE SHOES

12 EVERYWHERE. JEWELRY, EVERY PICTURE WE HAVE OF HIM HE HAS

13 SOME SORT OF JEWELRY ON, EVEN BACK BEFORE.

14 OH, BY THE WAY, ABOUT THE FELONY. YOU KNOW, HE

15 SHOWED THE IDENTIFICATION CARD. IT'S THE SAME NAME, SAME

16 DATE OF BIRTH, ALL OF THAT STUFF MATCHES UP AS TO HIM

17 BEING A CONVICTED FELON.

18 BUT THEN, NOT ONLY DOES HE SAY ON SEVERAL OCCASIONS

19 WHAT HE'S DONE WITH THAT MONEY, HE THEN, WHEN HE'S ASKED

20 ABOUT USING THAT FOR THE HOUSE, THE SAME HOUSE WHERE THE

21 DRUGS ARE BEING STORED, AND AGAIN, THIS IS IN BEHALF OF

22 MONEY LAUNDERING. FURTHER, WHEN YOU TAKE THE PROCEEDS

23 FROM YOUR SALE AND USE IT TO KEEP THAT HOUSE, MAKE THE

24 FINANCIAL TRANSACTION OF GIVING MONEY TO SOMEBODY. WHEN

25 HE SAID AS RECENTLY AS HE HAD JUST GIVEN HIS MOTHER $500

FOR A HOUSE PAYMENT, A HOUSE PAYMENT FOR THAT HOUSE, THE
ONLY HOUSE HE'S EVER LIVED AT.  THE SAME PLACE HE STORED
HIS DRUGS.  THE SAME PLACE HE'S SELLING DRUGS RIGHT OUT IN
FRONT OF.  THAT AGAIN IS MONEY LAUNDERING.  ADDITIONALLY,
BY PAYING FOR THE CABLE BILL AND BY GIVING $1,000 TO HELP
OUT AND, OF COURSE, GIVING IT TO HIS MOTHER.  HE DOESN'T
HAVE A JOB.  HE'S GIVING HER $1,000 A MONTH.  AGAIN,
PURCHASING THAT TELEVISION SET, AND YOU SAW THE TELEVISION
SET.

    AGAIN, YOU KNOW, HE MADE -- THERE WAS SOME ISSUES
ABOUT HIM BEING INVOLVED IN RAP MUSIC OR THE RAP MUSIC
BUSINESS.  WHEN YOU SAW HIM THROWING OUT MONEY IN THE
SINK, WAS IT MUSIC?  WAS IT A VIDEO?  NO.  IT WAS JUST
SOMEBODY BRAGGING ABOUT HOW HE'S GETTING AWAY WITH
POISONING THE COMMUNITY.  YOU SAW THE VERY FIRST
PHOTOGRAPH OF HIM FLASHING ALL OF THAT CASH.  ONCE AGAIN,
BRAGGING THE FACT THAT HE'S POISONING THE COMMUNITY.  NO
EVIDENCE OF ANY RECORD CONTRACTS, ANY RECORD DEALS,
ANYTHING THAT WOULD SUBSTANTIATE ANYTHING LIKE THAT,
EXCEPT FOR ILL-GOTTEN GAINS.

    NOW, AGAIN, THEY SAY THAT, YOU KNOW, WHEN YOU LOOK
BACK AT THE STATEMENT, THE STATEMENT THAT HE GAVE TO LAW
ENFORCEMENT AS IT RELATES TO THE CONSPIRACY CHARGE AND,
AGAIN, OF COURSE HE DID TELL YOU FROM THAT STATEMENT THAT
HE HAD THE FIREARM AND HE ALSO GOT THE MAGAZINE.  AND, YOU

1    KNOW, YOU MIGHT ASK YOURSELVES WHERE WAS THE REST OF THE

2    MONEY?  WELL, HE TOLD THE OFFICERS WHAT HE HAD DONE WITH

3    IT, HE BURIED IT, AND YOU WILL NEVER FIND IT.  I BURIED

4    GUNS AND YOU WILL NEVER FIND THEM.

5        STARTED DEALING AGAIN.  WHEN YOU TALK ABOUT PIECES TO

6    WEIGHT, FROM HIS OWN MOUTH, THE PICTURE IS WORTH A

7    THOUSAND WORDS, FROM HIS OWN ARM.  HE STARTED SELLING $50

8    A GRAM, STARTED OUT, AND WORKS HIS WAY ALL THE WAY UP.

9    HAS GONE FROM TAKING POWDER COCAINE TO CRACK COCAINE.

10   SOLD AS MUCH AS 5 KILOGRAMS OF CRACK COCAINE INTO THE

11   COMMUNITY TO SATISFY HIS GREED, AND FOR NO OTHER REASON.

12       WELL, I CAN'T SAY REALLY FOR NO OTHER REASON BECAUSE,

13   AS HE TOLD YOU, HE WANTED TO TAKE SOME OF THE PROCEEDS AND

14   PUT IT INTO HIS MUSIC BUSINESS.  AGAIN, THAT'S MONEY

15   LAUNDERING.  AGAIN, TRIPS, TRAVELING TO MIAMI, TO

16   CHARLOTTE, TO ATLANTA.

17       NOW, AND I'LL JUST -- I KNOW YOU HAVE SEEN THESE

18   THINGS, YOU KNOW, AS IT RELATES TO THE WEIGHT AND YOU

19   HEARD THE PROFESSIONAL WITNESSES ALL COME IN AND THEY ALL

20   TESTIFIED IN EACH OF THESE CASES.  THAT ON NOVEMBER 9, YOU

21   HEARD SPECIAL AGENT PATRICK TESTIFY THAT IT WAS 60 GRAMS

22   ON THE FIRST DEAL.  CERTAINLY 60 GRAMS IS MORE THAN

23   50 GRAMS.  AND THEN ON THE SECOND DEAL, DECEMBER 5, WHERE

24   THE DISTRIBUTION WAS FOR 27 GRAMS, AGAIN OF CRACK COCAINE.

25   THERE'S BEEN NO EVIDENCE OF ANYTHING ELSE, AND THAT WAS

TESTIFIED BY AGENT MOORE.  AND THEN FINALLY BRITTANY

DEWELL TESTIFIED THAT 72 GRAMS WAS TAKEN OUT OF THAT VENT.

IF YOU LOOK AT THE PICTURES OF THAT WEALTH OF WHERE HE IS

THROWING THE LIVES OF THE COMMUNITY AWAY, WHAT HE IS

SPENDING IT ON, AND HOW FAR HIS ROOM IS FROM WHERE THOSE

DRUGS WERE FOUND.

YOU KNOW, I GUESS HE DOES HAVE A BUSINESS.  HE REALLY

HAS AN OFFICE, IF YOU THINK ABOUT IT.  THAT BATHROOM IS

HIS OFFICE, RIGHT?  IF YOU THINK ABOUT IT, IF YOU GO BACK

TO THE VIDEO, HE'S THROWING ALL THE MONEY IN THERE AND YOU

FAST FORWARD SEVERAL MONTHS TO THAT SAME VENT IN THE SAME

AREA WHERE YOU HAVE 72 GRAMS OF COCAINE BASE.

FINALLY, OF COURSE, YOU HAVE SEEN ALL OF THESE WHERE

MS. LEWIS PICKED OUT THE AUTOMOBILE AND SIGNED ALL THE

DOCUMENTS AND TOLD YOU EXACTLY WHAT SHE DID TO FURTHER THE

OBJECTIVES.

FINALLY, YOU KNOW, MR. PARKER'S LIFE IS ABOUT MONEY

BECAUSE TO HIM MONEY IS POWER, IS RESPECT, RIGHT?  AND

WHAT HE'S WILLING TO DO AND WHAT ALL THE EVIDENCE HAS

SHOWN IS HE'S WILLING TO POISON THE COMMUNITY, HE'S

WILLING TO TAKE COCAINE BASE, CRACK, WHICH I DON'T THINK

ANYBODY WOULD SAY IS A GOOD THING, I DON'T THINK ANYBODY

WOULD EVER ARGUE WITH THE IDEA THAT CRACK COCAINE IS

RIPPING APART THE FABRIC OF OUR SOCIETY, AND HE'S WILLING

TO SELL THAT INTO THE COMMUNITY BECAUSE HE WANTS, AND

1  YOU'VE SEEN THESE PICTURES, HE WANTS THE MONEY.  IT'S ALL

2  ABOUT THE MONEY.  THANK YOU.

3       **THE COURT:**  ALL RIGHT.  THANK YOU, MR. SEVERO.

4  MR. WALEN.  MR. WALEN, THE JURY AND I LOOK FORWARD TO

5  HEARING FROM YOU, SIR.

6       **MR. WALEN:**  ALL THIS EVIDENCE, ALL THESE

7  EXHIBITS, TAPES, I FEEL LIKE THE LEAD HORSEMAN IN THE

8  CHARGE OF THE LIGHT BRIGADE.

9       A DISCLAIMER BEFORE I START.  IF I MISQUOTE SOMETHING

10  THAT YOU HEARD OR IF I TELL YOU SOMETHING THAT'S THE LAW

11  THAT'S INCORRECT, THE PERSON THAT ACTUALLY TELLS YOU THE

12  LAW IS THE JUDGE.  I MAY MAKE A MISTAKE, I DON'T

13  INTENTIONALLY DO IT, BUT ANYTHING I SAY IS STRICTLY

14  SOMETHING I SAY.  IT'S NOT THE LAW, IT'S NOT THE FACT,

15  IT'S FOR YOU TO REMEMBER WHAT THE FACTS ARE AND FOR THE

16  JUDGE TO INSTRUCT YOU ON WHAT THE LAW IS.

17       I'M NOT GOING TO GO OVER ALL THE EVIDENCE, ALL THE

18  STUFF YOU HEARD.  I'M JUST GOING TO POINT OUT SOME OF THE

19  STUFF THAT'S NOT PROVEN TO YOU.

20       FIRST OF ALL, A CONSPIRACY TAKES TWO PEOPLE.  YOU CAN

21  NOT HAVE A CONSPIRACY BY YOURSELF, YOU HAVE TO HAVE A

22  CO-CONSPIRATOR.  THERE'S NO SUCH THING AS A ONE-PERSON

23  CONSPIRACY.

24       IF I MEET WITH ANOTHER PERSON AND HIM AND I SIT

25  TOGETHER OR HER AND I SIT TOGETHER AND WE SAY TO EACH

OTHER, I THINK WE'LL GO ROB A QUICK STOP, I NEED SOME

MONEY FOR SOME COCA COLA OR BEER OR POTATO CHIPS OR

WHATEVER, SO WHY DON'T WE GO ROB THE 7/11 ON THE CORNER.

YOU PEOPLE PROBABLY DON'T HEAR MUCH OF 7/11, THEY ARE

MOSTLY IN OTHER STATES.  AND THEN WE GET UP AND WE GO OUT

AND GET IN THE CAR.  WHEN WE GET TO THE 7/11 THERE'S A

BUDDY OF MINE STANDING OUT FRONT.  I SAY TO HIM, HOW ABOUT

GETTING BEHIND THE WHEEL, WE'RE GOING TO ROB THIS 7/11, BE

RIGHT OUT.  HE GETS IN THE CAR, CRANKS UP THE ENGINE AND

WAITS ON US.

WELL, THE TWO PEOPLE, MYSELF AND THE PERSON THAT I

DISCUSSED THIS WITH, ARE GUILTY OF A CONSPIRACY BECAUSE WE

SAT THERE AND PLANNED IT.  THE OTHER PERSON ISN'T.  HE'S

NOT PART OF THE CONSPIRACY.  HE MAY BE GUILTY OF THE ARMED

ROBBERY, BUT HE'S NOT GUILTY OF A CONSPIRACY.  BUT THE

CONSPIRACY ENDS.  DON'T LET THEM CONFUSE YOU.

THERE'S THREE CHARGES OF DISTRIBUTING CRACK, SELLING

CRACK OR HAVING CRACK WITH INTENT TO DISTRIBUTE, BUT

THAT'S NOT TO BE CONFUSED WITH THE CONSPIRACY, THAT'S A

SEPARATE CHARGE.  THE CONSPIRACY ENDS AS SOON AS YOU MAKE

THE PLAN.  TO HAVE THAT CONSPIRACY YOU HAVE TO HAVE A

PLAN.

THERE'S NO EVIDENCE THAT HE PLANNED WITH ANYBODY, IF

YOU BELIEVE THAT HE ACTUALLY DISTRIBUTED THE DRUG, THERE

IS ABSOLUTELY NO EVIDENCE IN FRONT OF YOU THAT SHOWS HE

PLANNED WITH ANYBODY TO DISTRIBUTE THOSE, TO POSSESS THE

DRUGS WITH THE INTENT TO DISTRIBUTE THEM.  NOT TO

DISTRIBUTE THEM, NOT TO SELL THEM, NOT TO MANUFACTURE

THEM, TO POSSESS WITH THE INTENT TO DISTRIBUTE.  THERE IS

NO EVIDENCE OF THAT.

NEXT, THE POSSESSION OF A FIREARM DURING A DRUG

TRAFFICKING CRIME.  YOU KNOW, YOU CAN'T JUST POSSESS A

FIREARM.  IF YOU BELIEVE HE POSSESSED THAT FIREARM BECAUSE

HE SAID IT IN HIS CONFESSION, ALLEGEDLY, IF YOU BELIEVE

THAT THAT FIREARM WAS HIS, YOU HAVE TO ALSO BELIEVE -- YOU

CAN'T BELIEVE THAT HE JUST MERELY HAD IT.  YOU HAVE TO

BELIEVE THAT SOMEHOW IT WAS RELATED TO HIS DRUG ACTIVITY.

NOW, COMMON SENSE WOULD TELL YOU THAT IF YOU ARE

GOING TO USE A GUN TO PROTECT YOURSELF DURING DRUG BUYS OR

DRUG SALES OR TO PROTECT YOURSELF PERIOD, YOU ARE NOT

GOING TO SEAL IT IN A HERMETICALLY SEALED PLASTIC ENVELOPE

AND LEAVE THE MAGAZINES OUTSIDE.  YOU ARE GOING TO HAVE IT

READY TO USE.

EVERY TIME I ASKED SOMEBODY THAT WAS INVOLVED IN ONE

OF THESE DRUG DEALS, A POLICE OFFICER, AN AGENT, A

CO-DEFENDANT, WHAT I CALL A CONFIDENTIAL INFORMANT, NONE

OF THEM, NONE OF THEM COULD EVER SAY THAT THEY SAW

SOMEBODY WITH A GUN DURING ANY OF THESE DRUG DEALS.  SO

THERE'S REALLY NO EVIDENCE THAT HE POSSESSED THIS FIREARM

DURING A DRUG TRAFFICKING CRIME.

1    HE MAY HAVE POSSESSED IT, HE MAY NOT HAVE BEEN

2    ALLOWED TO POSSESS IF IT, IF HE WAS A CONVICTED FELON LIKE

3    THEY TESTIFIED.  BUT HE DIDN'T USE IT IN FURTHERANCE OF A

4    DRUG CRIME; IT WAS JUST MERELY THERE.  THAT'S THE

5    DIFFERENCE BETWEEN JUST POSSESSING IT AND POSSESSING IT

6    AND USING IT IN A DRUG CRIME.

7    NEXT, THEY CHARGE HIM WITH -- NOT WITH LAUNDERING

8    MONEY, NOT WITH LAUNDERING PROCEEDS OF DRUG TRANSACTIONS,

9    BUT CONSPIRACY TO LAUNDER MONEY.  AGAIN, YOU HAVE TO HAVE

10   TWO PEOPLE TO HAVE A CONSPIRACY.  WHO'S THE SECOND PERSON?

11   WHO DID YOU HEAR ANYBODY TESTIFY TO THAT EXPIRED WITH HIM

12   TO LAUNDER THIS DRUG MONEY?  NOT ONE SINGLE PERSON.  THEY

13   TRIED TO IMPLY THAT THE AUTO PLACE WAS SOMEHOW INVOLVED IN

14   IT, BUT THAT DOESN'T MAKE ANY SENSE.  THEY TRIED TO IMPLY

15   THAT THE COUSIN WAS SOMEHOW INVOLVED IN IT.  SHE NEVER

16   SAID SHE EVEN KNEW IT WAS DRUG MONEY, IF IT WAS DRUG

17   MONEY.

18   JUST THE FACT THAT SOMEBODY COUNTS HUNDREDS INTO A

19   SINK ON U-TUBE OR MYSPACE, WHICHEVER IT WAS, OR THAT

20   SOMEBODY BUYS A BUNCH OF CARS WITH THE MONEY, OR THAT

21   SOMEBODY BUYS DIAMONDS AND SOMEBODY FLASHES IT ON VIDEOS,

22   BUYS A LOT OF SHOES, DOES THAT SOUND LIKE LAUNDERING

23   MONEY?  IF YOU ARE GOING TO LAUNDER MONEY YOU ARE TRYING

24   TO HIDE IT, YOU ARE NOT MAKING IT OBVIOUS THAT YOU HAVE

25   ALL OF THIS MONEY, YOU ARE NOT GOING OUT AND BUYING THINGS

WITH IT.  IT MAY BE EXTRAVAGANT, IT MAY BE STUPID, IT MAY

BE RIDICULOUS TO SPEND ALL OF THAT MONEY AND TO SHOW IT,

BUT IF YOU ARE LAUNDERING MONEY YOU WILL NOT GO ON

MYSPACE, U-TUBE, ONE OF THEM, AND COUNT IT INTO A SINK.

YOU ARE TRYING TO HIDE IT, NOT TELL THEM ABOUT IT.  HE

DIDN'T HAVE ANY OFFSHORE ACCOUNTS IN THE CAYMAN ISLANDS.

YOU DIDN'T HEAR ANYBODY SAY THEY GOT TOGETHER WITH HIM OR

THE TWO OF THEM TOGETHER SAID, I'M GOING TO LAUNDER THIS

MONEY, I'M GOING TO HIDE IT, THE PROCEEDS, FROM MY DRUG

BUY.  NOT ONE PERSON TESTIFIED TO THAT.  THAT'S WHAT IT

TAKES TO MAKE A CONSPIRACY.  WITHOUT A CO-CONSPIRATOR, YOU

DON'T HAVE A CONSPIRACY.

YOU KNOW, THAT'S THE WEAKNESSES IN THEIR CASE.  THE

CONSPIRACY TO POSSESS WITH INTENT TO DISTRIBUTE DRUGS, THE

POSSESSION OF A FIREARM DURING A DRUG TRAFFICKING CRIME,

AND THE MONEY LAUNDERING CHARGES.  THANK YOU.

**THE COURT:**  THANK YOU, MR. WALEN.  ALL RIGHT,

MR. SEVERO, WE WILL HEAR YOUR REBUTTAL.

**MR. SEVERO:**  THANK YOU, YOUR HONOR.  I'M GOING

TO JUST ADDRESS MY REMARKS TO THE STATEMENTS THAT WERE

MADE BY MR. WALEN.

AS HE SPEAKS ABOUT THE CONSPIRACY PORTION, ESPECIALLY

FOCUSING ON THE DRUGS, WHEN HE SAID THERE WASN'T AN

AGREEMENT.  CERTAINLY THERE WAS AN AGREEMENT WITH

MR. RIVERS TO DISTRIBUTE THE DRUGS.  CERTAINLY WAS AN

AGREEMENT WITH THE HISPANIC MALE THAT HE TALKED ABOUT FROM
TEXAS, AND HIS AGREEMENT TO CONTINUE TO SELL DRUGS TO
PEOPLE IN THE COMMUNITY FOR THAT LONG, EXTENDED PERIOD OF
TIME.

I'M NOT SAYING THOSE INDIVIDUAL TWO BUYS, THOSE ARE
SEPARATE.  I'M TALKING ABOUT ALL THE OTHER TIMES, THE TIME
THAT HE DESCRIBED ON A BI-MONTHLY BASIS DISTRIBUTING LARGE
AMOUNTS TO PEOPLE WHO AGREED TO BUY IT.  THAT HE AGREED TO
RECEIVE THAT COCAINE FROM THOSE SOURCES OUTSIDE OF NORTH
CAROLINA AND THEN DISTRIBUTE THEM.  THAT HE AGREED WITH
MR. RIVERS TO PROVIDE MR. RIVERS WITH IT.

YOU KNOW, HE DIDN'T CARE ABOUT THE FACT THAT IT WAS
BEING SOLD TO OTHER PEOPLE BECAUSE YOU HEARD THE TAPE IN
WHICH MR. BATTS SAID, IF MY PEOPLE DON'T LIKE IT I'M GOING
TO COME BACK TO YOU.  THAT'S OKAY, IT WILL BE STRAIGHT,
THAT'S OKAY, IT'S BUTTER.  HE KNEW WHERE IT WAS GOING AND
WHAT HE WAS GOING TO DO.

MR. WALEN TALKED ABOUT THE POSSESSION.  YOU HEARD ALL
THE FACTS ABOUT THAT, SO I'M NOT GOING TO REHASH IT.

WHEN HE MENTIONS ABOUT THE FIREARM, THIS DEFENDANT
BEING A CONVICTED FELON COULDN'T LEGALLY POSSESS A
FIREARM.  THERE'S CERTAINLY NO EVIDENCE THAT HE PACKAGED
IT UP.  HE BOUGHT IT FROM SOMEBODY THE DAY BEFORE SO IT
WAS PROBABLY STILL IN THE PACKAGE WHEN HE BOUGHT IT.  HE
HAD IT THERE STILL FOR PROTECTION.

1       ADDITIONALLY, AGAIN, THE TYPE OF WEAPON, PROXIMITY TO

2   THE DRUGS AND PROXIMITY IS WHAT YOU SHOULD FOCUS ON IN

3   FURTHERANCE OF THE DRUG TRAFFICKING OFFENSE.

4       AS HE TALKS ABOUT THE CONSPIRACY TO MONEY LAUNDER,

5   THOSE AGREEMENTS TO DO THOSE ACTIONS WITH THOSE OTHER

6   PEOPLE, I THINK SPEAK FOR THEMSELVES.  THANK YOU.

7            **THE COURT:**  ALL RIGHT.  THANK YOU, SIR.

8

9

10

11

12

13

14

15

16

17

18

19

20                      END OF TRANSCRIPT

21

22

23

24

25

1                        CERTIFICATE

2       THIS IS TO CERTIFY THAT THE FOREGOING TRANSCRIPT OF

3   PROCEEDINGS TAKEN AT THE CRIMINAL SESSION OF UNITED STATES

4   DISTRICT COURT IS A TRUE AND ACCURATE TRANSCRIPTION OF THE

5   PROCEEDINGS TAKEN BY ME IN MACHINE SHORTHAND AND

6   TRANSCRIBED BY COMPUTER UNDER MY SUPERVISION.

7       THIS THE 5TH DAY OF MARCH, 2011.

8

9                           /S/ DONNA J. TOMAWSKI

10                          DONNA J. TOMAWSKI
                            OFFICIAL COURT REPORTER
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25